## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

RURAL COMMUNITY WORKERS ALLIANCE
and JANE DOE;

     *Plaintiffs*,

v.

SMITHFIELD FOODS, INC. AND SMITHFIELD
FRESH MEATS CORP.,

     *Defendants*.

CIVIL ACTION NO:

## COMPLAINT

## INTRODUCTORY STATEMENT

1.     Supplying the nation with food during the COVID-19 crisis is an essential task.

2.     Equally essential is the need for businesses engaged in the production and sale of food—including large corporate meat and poultry processors like Defendants Smithfield Foods, Inc. and Smithfield Fresh Meats Corp. (collectively "Smithfield")—to ensure the safety and protection of their critical workforce, the communities within which they operate, and the public generally

3.     In the last month, America has seen how an employer's failure to protect its workforce can result in disaster. Thousands of workers employed in the food supply chain around the country have fallen ill with COVID-19. They have gone on to infect family members and community members and their illnesses have strained our healthcare infrastructure. Many workers and their family members have died as a consequence of infections that have spread at workplaces in our Nation's food supply chain.

4.     Workers employed by Smithfield are all too familiar with this phenomenon.

5.     Smithfield is one of the largest and most profitable meat producers in the United States.

6.     Yet, several plants owned and operated by Smithfield around the country have become major COVID-19 hot spots.

7.     Earlier this month, hundreds of employees of Smithfield's plant in South Dakota contracted COVID-19, and Smithfield was forced to close that plant after it became the country's leading hot spot. At least two of those employees has died.

8.     Also recently, workers at a Smithfield plant in Cudahy, Wisconsin raised concerns after that plant experienced more than two dozen confirmed cases.

9.     Notwithstanding the horrific situation facing many of its employees around the country and abundantly clear guidance from the Centers for Disease Control (CDC) and state public health officials, Smithfield continues to operate its plant in Milan, Missouri in a manner that contributes to the spread of disease.

10.     In direct contravention of CDC guidelines, at its Milan, MO plant Smithfield (1) provides insufficient personal protective equipment; (2) forces workers to work shoulder to shoulder and schedules their worktime and breaks in a manner that forces workers to be crowded into cramped hallways and restrooms, (3) refuses to provide workers sufficient opportunities or time to wash their hands, (4) discourages workers from taking sick leave when they are ill and even establishes bonus payments that encourage workers to come into work sick, and (5) has failed to implement a plan for testing and contact-tracing workers who may have been exposed to the virus that causes COVID-19.

11.     Smithfield is so unwilling to acknowledge its responsibilities to its workers and the communities where it operates that it recently blamed "certain cultures" for the spread of the disease in its South Dakota plant, rather than its failure to provide personal protective equipment,

failure to allow for hand washing and social distancing, and the policies its maintains in plants around the country to incentivize sick workers to continue coming to work.[1]

12.     Smithfield may perceive that these policies allow the company to continue producing and packaging as much pork as possible for as cheaply as possible.

13.     In fact, however, the costs of Smithfield's conduct are extraordinary, but they are borne by Smithfield's workers, their family members, and the broader community.

14.     Put simply, workers, their family members, and many others who live in Milan and in the broader community may die—all because Smithfield refused to change its practices in the face of this pandemic.

15.     Fortunately, workers and other community members at risk are not helpless in protecting themselves from this harm. Centuries-old common law principles, including the doctrine of public nuisance, allow private parties to enforce the right of the public generally to abate conduct that contributes to the spread of pestilence and disease.

16.     This suit does not seek money damages. All Plaintiffs seek is an injunction to force Smithfield to change its practices such that if it continues to operate, it must comply with, at a bare minimum, CDC guidance, the orders of state public health officials, and additional protective measures that public and occupational health experts deem necessary based on the particular structure and operation of the Milan plant.

17.     Because Smithfield will not act, the law allows Plaintiffs to seek redress to ensure the safe operation of the facility and to protect their community.

---

[1] Albert Samaha, *Smithfield Foods Is Blaming 'Living Circumstances In Certain Cultures' For One of America's Largest COVID-19 Clusters*, BuzzFeed News (Apr. 20, 2020), https://www.buzzfeednews.com/article/albertsamaha/smithfield-foods-coronavirus-outbreak

3

## THE PARTIES

*Defendant Smithfield*

18.     Defendant Smithfield Foods, Inc. is a Virginia corporation with its headquarters in Smithfield, Virginia.

19.     Defendant Smithfield Fresh Meats Corp. is a Virginia corporation with its principal place of business in Smithfield, Virginia.

20.     Smithfield owns and operates a meat processing plant in Milan, Missouri (the "Plant").

21.     Smithfield is one of the largest meat processors in the United States. It has over 50,000 employees nationwide. As of late 2018, its annual revenues exceeded $15 billion.

*Plaintiff Jane Doe*

22.     Plaintiff Jane Doe is participating in this action under a pseudonym because her years of experience working for Smithfield suggest to her that Smithfield is likely to retaliate against her for speaking out against the company.

23.     Doe resides in Milan, Missouri and has worked at Smithfield in Milan for more than 5 years.

24.     For most of that time, she has worked on the "cut floor" where she works side-by-side with several other workers to cut and process pig meat for up to eleven hours every day.

25.     Doe's work at the plant has always been grueling, repetitive, and in many cases, dangerous, but since the emergence of the COVID-19 pandemic, she has become more fearful and concerned than ever by the workplace conditions to which she is subjected while working at the Milan Plant.

26.     Doe is aware of at least eight co-workers who have had to stay home after displaying COVID-19 symptoms.

4

27.     Doe is scared of the potential consequences she faces for filing this lawsuit; she and her family depend on Smithfield, and she does not want to lose her job or hurt her standing with the company.

28.     Doe is participating in this case, notwithstanding those fears, because she considers Smithfield's failure to follow the health and safety standards that she has heard so much about through the media—including setting up rules to allow for social distancing, hand washing, and to encourage workers to take sick leave—to present a dire threat to her health, the health of her coworkers, her family, including her children, and to her entire community.

*Plaintiff RCWA*

29.     Plaintiff Rural Community Workers Alliance ("RCWA") is a Missouri non-profit corporation with its principal place of business in Green City, Missouri.

30.     RCWA is a membership organization whose members consist exclusively of workers in Northern Missouri, including numerous members who work at the Plant. Seven members of RCWA's current leadership council work at the Plant and between 60 and 70 workers who attend its meetings work at the Plant. Hundreds of the Plant's workers have used RCWA's services over the years.

31.     RCWA's members nominate representatives to serve on the organization's Health Action Council, which in turn sets the direction and activities of the organization.

32.     RCWA's members continue to perform their essential job functions at the Plant, but they are fearful for their own health and safety and the health and safety of their families and community due to the risk of contracting COVID-19 created by Smithfield's working environment.

33.     RCWA has expended significant resources and time responding on behalf of its members to Smithfield's failure to implement adequate policies related to the COVID-19 crisis.

34.     Prior to COVID-19, RCWA was especially focused on (i) advocating for greater protections from repetitive stress injuries that are rampant at the Smithfield plant, (ii) advocating for increased opportunities for bathroom breaks, as employees have had to wear diapers on the line; and (iii) organizing gatherings and cultural events for the workers. RCWA's work included educating workers on their rights, helping them obtain legal and medical support to aid treatment for the musculoskeletal problems and kidney disorders that are common at the Smithfield plant—including transporting the workers to those appointments—and developing contacts to help workers with those concerns.

35.     Since COVID-19, at the direction of its worker members, RCWA has diverted its resources to focus almost entirely on the immediate threat to health and safety due to COVID-19, particularly the lack of personal protective equipment, paid sick leave, and overcrowding. These were not issues that RCWA focused on in the past.

36.     Because COVID-19 exposure at the Plant also places families and the community at risk, RCWA has also been working on ways to protect people once workers leave the plant. This has included research and hosting virtual meetings about these issues, such as instructing workers about how to decontaminate at home. These were not concerns that RCWA addressed previously.

37.     Because Smithfield is placing its community at risk, it is also placing RCWA at risk.

38.     RCWA is a small organization with a single staff person, Axel Fuentes. Because he lives in Kirksville, near Milan, Mr. Fuentes fears for the health and safety of his family due to Smithfield's failure to adequately respond to the COVID-19 crisis. Many Plant workers live in

6

Kirksville, and it has one of the few grocery stores in the area, which is frequented by people from the Plant. Mr. Fuentes and his family make reasonable efforts to protect themselves from the disease, but need to interact with the world, including walking outside and buying groceries. Mr. Fuentes also fears for the health and safety of himself and his family because his job with RCWA brings him into close contact with workers from the Plant, whom Smithfield is failing to protect. It is part of Mr. Fuentes' job to continue to support RCWA's worker members, including workers at the Plant. For example, Mr. Fuentes gathered signatures from workers on a letter that was sent to Smithfield on April 2 documenting unsafe conditions at the plant, and obtaining these signatures required Mr. Fuentes to come into close contact with plant workers. Providing this type of support to workers is core to Mr. Fuentes' functions as Executive Director of RCWA. Mr. Fuentes could not fully carry out his duties without being in contact with workers in these ways, including RCWA members who work at the Plant.

39.    Mr. Fuentes and his family are at heightened risk for contracting COVID-19 due to the points of transmission Smithfield has created at the Plant. Mr. Fuentes' inability to work would undermine RCWA's ability to operate, which would place its members and the community at risk.

## JURISDICTION AND VENUE

40.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331(federal question) and 28 U.S.C. § 1332 (diversity).

41.    Plaintiffs' claims arise under the laws of the United States because the question of whether Smithfield's conduct violates state law involves interpreting federal rules and guidance, including guidance from the Centers for Disease Control and the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency.

7

42.     The Court has diversity jurisdiction because both Plaintiffs are residents of Missouri and both Defendants are residents of Virginia with their principal place of business in Virginia.

43.     Furthermore, the cost to Smithfield of implementing the injunctive relief requested below, including the costs necessitated by providing proper personal protective equipment, implementing proper social distancing, providing COVID-19-related sick leave, providing additional break time, altering the configuration or speed of the line or staggering shifts, and developing and implementing a testing and contact-tracing protocol, is in excess of $75,000.00.

44.     Venue is proper pursuant to 28 U.S.C. § 1391 in the Western District of Missouri because the acts and omissions that are the subject of this action all occurred in the Western District of Missouri.

## STATEMENT OF FACTS

### A. The COVID-19 Pandemic

45.     COVID-19 is an infectious respiratory disease caused by a novel coronavirus.

46.     COVID-19 can result in serious, long-term health complications and has resulted in more than 40,000 reported deaths in the United States to date. Among these serious health complications, COVID-19 can cause inflammation in the lungs, clogging the air sacs in the lungs, limiting the body's oxygen supply and blood clots, organ failure, intestinal damage, heart inflammation, problems with the liver, neurological malfunction, and acute kidney disease.

47.     Some populations are especially vulnerable to the consequences of COVID-19, including individuals 65 years and older, people living in a nursing home or long-term care facility, and others of all ages with underlying medical conditions, such as people with lung disease, asthma, heart conditions, severe obesity, diabetes, kidney disease, or liver disease and people who are immunocompromised.

8

48. Some conditions that can cause compromised immunity include cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications.

49. The novel coronavirus that causes COVID-19 is also highly contagious.

50. COVID-19 appears to spread easily and sustainably across the world through "community spread."

51. Community spread means that people have been infected with the virus in an area, including some who are not sure how or where they became infected.

52. The virus spreads mainly person to person, primarily through respiratory droplets produced when an infected person coughs or sneezes.

53. Spread is more likely when people are in close contact with one another (within about 6 feet for longer than 10 minutes).

54. The virus can be spread even by people who are "asymptomatic," meaning they carry the active virus in their body but never develop any symptoms; "pre-symptomatic," meaning they have been infected and are incubating the virus but don't yet show symptoms; or very mildly symptomatic, feeling unwell but continuing to come in close contact with others.

55. Recent research from the CDC suggests that a single person with COVID-19 is likely to infect five or six other individuals absent aggressive social distancing practices.

56. The best way to prevent illness is to avoid being exposed to this virus.

**B. Missouri's Response to the COVID-19 Crisis**

57.     On March 13, 2020, Governor Parson declared a state of emergency in the State of

Missouri in response to the COVID-19 crisis.[2]

58.     On April 3, 2020, the Missouri Department of Health and Senior Services issued a stay-

at-home order, which limited operations for, or closed, all non-essential businesses in Missouri.[3]

59.     The stay-at-home order defined essential businesses consistent with federal guidance

from the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security

Agency.[4]

60.     The federal guidance defines the following category of businesses as essential businesses:

> Food manufacturer employees and their supplier employees—to
> include those employed in food ingredient production and
> processing facilities; ***livestock, poultry, seafood slaughter
> facilities***; pet and animal feed processing facilities; human food
> facilities producing by-products for animal food; beverage
> production facilities; and the production of food packaging.[5]

61.     According to the federal guidance, the labeling of essential businesses is based on "key

principles," including:

> 1. Response efforts to the COVID-19 pandemic are locally
> executed, state managed, and federally supported.

---

[2] *See* Mo. Exec. Order No. 20-20 (Mar. 13, 2020),
https://www.sos.mo.gov/CMSImages/Library/Reference/Orders/2020/20-02.pdf.

[3] *See* https://governor.mo.gov/priorities/stay-home-order.

[4] *See*
https://www.cisa.gov/sites/default/files/publications/CISA_Guidance_on_the_Essential_Critical_Infrastructure_Workforce_Version_2.0_Updated.pdf.

[5] *Id.* at 6 (emphasis added).

10

2. ***Everyone should follow guidance from the CDC***, as well as State and local government officials, regarding strategies to limit disease spread.

3. Workers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations.

4. ***When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not necessarily limited to, separating staff by off-setting shift hours or days and/or social distancing. These steps can preserve the workforce and allow operations to continue.***

5. All organizations should implement their business continuity and pandemic plans or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the health and safety of the employees.[6]

## C.  The Centers for Disease Control Response to the COVID-19 Pandemic

62.      In response to the COVID-19 crisis, the CDC published guidance for employers and

employees, including *Interim Guidance for Businesses and Employers to Plan and Respond to*

*Coronavirus Disease 2019 (COVID-19).*[7]

63.      The purpose of the guidance is "help prevent workplace exposures to COVID-19, in non-

healthcare settings" and to "provide[] planning considerations for community spread of COVID-

19." *Id.*

64.      The following is a summary of some of these guidelines:

1.      Employees who have symptoms should stay home and employers should develop flexible leave policies to allow

---

[6] *Id.* at 3-4 (emphasis added).

[7] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

11

employees to stay home, particular by creating non-punitive leave sick leave policies;

2.      Employers should not require a positive COVID-19 test or a healthcare provider's note for employees to take sick leave;

3.      Sick employees should not return to work except in consultation with independent health care providers and state and local health departments;

4.      Employers should reduce face-to-face contact between employees;

5.      Employers should take steps to reduce transmission at the workplace by reassigning work tasks to maintain social distance of six-feet, staggering shifts, or allowing telework;

6.      Employers should establish policies to minimize spread through a workplace by using contact-tracing and testing to identify workers who have likely been exposed to the disease and quarantining infected workers;

7.      Employees should be encouraged to wash their hands and employers should facilitate this by providing hand washing stations;

8.      Employers should provide tissues;

9.      Employers should increase ventilation rates; and

10.     Employers should develop plans to clean high touch areas with an EPA-approved cleaning agent.[8]

65.      In addition, the CDC recommends that all Americans wear cloth face coverings in public settings where other social distancing measures are difficult to maintain.[9]

---

[8] *Id.*

[9] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html

12

**D. Smithfield Has Failed to Respond to the COVID-19 Crisis by Satisfying Even these Minimum Public Health Standards**

66.    After the issuance of the Missouri stay at home order, the Milan Plant remained open as an "essential business."

67.    On April 2, 2020, seventy workers at the Plant sent a letter in which they explained they were being put at risk: they had no masks, the plant had no social distancing plan, workers were punished for trying to cover their mouths when they coughed or sneezed and provided no tissues, and Smithfield was punishing workers who took sick leave.

68.    Much of this remains true today.

69.    It was not until April 16, 2020 that *any* of the workers at the Milan plant reported receiving masks. Even then, those masks were only distributed to workers who divide the carcasses (the "cut floor"). Workers who strip the animal down to a carcass (on the "kill floor") did not receive masks until April 17, 2020.

70.    As of April 20, 2020, most of the workers in the Plant were receiving only one simple surgical mask from Smithfield every week. Smithfield has explained to some workers they can only receive a new mask if the first one broke.

71.    Smithfield still allows members of the Plant cleaning crew to enter, move around the workstations, and use the cafeteria and locker rooms without masks.

72.    Meat moves through the Plant from the point of slaughter on a conveyer belt along which workers are stationed. Each worker is assigned a particular task to dismember the animal. The animal then is transferred to another area of the plant where workers similarly stand side-by-side to break down the animal into pieces for shipment. Finally, the animal is transferred to a packing area.

13

73.　　To process as much meat as possible, as quickly and cheaply as possible, Smithfield packs many workers together in cramped spaces along processing lines.

74.　　Workers on the kill and cut floors have long described their fear of being cut by their neighbors' knives because they work so closely together.

75.　　Even workers in packaging describe so little space to move that they regularly bump into one another.

76.　　On both the kill and cut floors workers continue to work shoulder-to-shoulder, even while the rest of society exists under strict social distancing.

77.　　In fact, in an effort to continue processing as much meat as possible as cheaply as possible, Smithfield forces many workers to work so closely together that they are literally touching.

78.　　Smithfield has made no effort to alter any of these conditions. Although Smithfield has posted signs saying to avoid close contact with people who are sick, on the lines and in the packing areas workers are currently, regularly forced to stand significantly less than six feet apart.

79.　　Smithfield has installed "Plexiglas dividers" between some workers on the lines, but Smithfield failed to consider workers' varying heights, so the Plexiglas does not cover all workers' faces.

80.　　Many workers continue to work immediately next to their neighbors without any Plexiglass dividers, leading them to come into physical contact with one another on the line.

81.　　If Smithfield slowed the line, workers, including RCWA members, could be spaced farther apart and have time to take effective preventive measures, like wiping spittle from their mouths and covering their mouths when they cough or sneeze.

14

82.    However, since the closure of other Smithfield plants due to pandemic flare ups, Smithfield has only increased the line speed at the Milan Plant, placing more pressure on its workers at the Milan Plant and subjecting them to greater risk of disease.

83.    Smithfield also implements punitive measures to ensure its preferred line speed is maintained, including that missing even one piece of meat to clean one's face could result in punitive employment action.

84.    On the lines, workers, including RCWA members, are still not provided tissues or other materials to wipe away fluids that might come out during coughing or sneezing.

85.    Although Smithfield has erected some hand cleaning stations, it has not provided workers, including Jane Doe and RCWA members, with any additional break time to wash their hands or to use hand sanitizer.

86.    At times, Smithfield has sent people onto the line with sanitizer for the workers, but they will only spray workers' gloves, not their hands, allowing the worker to return to work as quickly as possible.

87.    This means that workers can go several hours performing grueling, monotonous work, shoulder to shoulder and sometimes even touching their coworkers, often without time to even cover their mouths when they sneeze or cough, and without any time to wash or sanitize their hands.

88.    Things are not much better off the line. While entering and leaving work and during breaks and lunch, workers, including Jane Doe and RCWA members, are forced to crowd into cramped hallways, including when they clock in and clock out for work.

89.    Furthermore, Smithfield has started taking workers' temperatures before they enter but it allows a close line to form while workers wait to be checked.

15

90.     Smithfield has not made efforts to stagger rest or meal breaks, meaning that while off the line, workers are cramped closely into hallways, bathrooms, and the cafeteria.

91.     Although Smithfield did expand the cafeteria and has hung signs recommending distancing there is still not enough space within the cafeteria for workers to sit six feet apart.

92.     Moreover, while Smithfield has installed Plexiglas down the center of the cafeteria tables, it has not provided protection for workers sitting side-by-side.

93.     Smithfield also continues to discourage workers from taking sick leave and encourages them to come into work sick.

94.     When the first reports of COVID-19 symptoms began to emerge at the Plant, some workers were scared and called in sick.

95.     Immediately after that, Smithfield began incentivizing workers not to take leave from work. Most importantly, early in the pandemic Smithfield offered a $500 bonus to all of its workers, but with an important catch: the bonus would not be available to any worker who misses a shift for any reason between April 1 and May 1.

96.     Smithfield even offered workers a free lunch at which Smithfield promoted the bonus.

97.     The image below is of a poster that remains posted inside the Plant:



98.　　Translated into English, the poster reads:

Heroes come in many forms. #ThankaFoodWorker

At Smithfield, we accept responsibility in everything we do. And we reward those who accept responsibility. As a show of our gratitude, you will receive a Responsibility Bonus of $500, paid the 15th of May 2020. To the members of our team who are crucial in our nation's response to COVID-19, thank you!

> *Note: To qualify for the Responsibility Bonus, you must work all scheduled hours and not receive a single attendance point between 4/1/20 and 5/1/20*

99.　　Jane Doe and RCWA's members cannot afford to lose their jobs, and $500 represents a

significant amount of money for them.

100.　　Milan does not offer many employment opportunities other than the Plant, and Smithfield

is the largest employer in the area.

101.　　Many of the workers have families, including children they need to support, and many

are currently living paycheck-to-paycheck. The $500 bonus is a substantial incentive for workers

to continue working at the Plant even when they are experiencing symptoms.

102.　　It is also unclear whether Smithfield will take negative actions, such as awarding a

negative attendance "point," against employees who voluntarily quarantine.

17

103.    Typically, Smithfield does not provide sick leave and assigns a "point" for any shift missed. If a worker receives 9 points in a year, Smithfield can take disciplinary action, including terminating workers.

104.    At least some workers report that Smithfield has said it will continue to assign points if a worker displaying COVID-19 symptoms stays home, as recommended by the CDC, unless Smithfield or a doctor order the worker to stay home.

105.    Finally, Smithfield has not implemented any policies that allow it to contact trace or test workers who have symptoms of the disease or have come into contact with the disease.

106.    Workers at the Plant work long and hard days and often have very little information about the lives of their hundreds of coworkers.

107.    But Smithfield knows precisely who is reporting symptoms and who has tested positive for the disease. Neither Jane Doe nor RCWA are aware, however, of any efforts by Smithfield to perform contact tracing to identify other workers who may have come into contact with the disease, including workers who have worked immediately side-by-side with infected workers.


**COUNT I: PUBLIC NUISANCE AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201**

**(BY JANE DOE AND RCWA AGAINST ALL DEFENDANTS)**

108.    Smithfield's failure to comply with minimum basic health and safety standards in its workplace, including the CDC guidelines and other minimum public health standards necessary to stop the spread of COVID-19, is causing, or is reasonably certain to cause, community spread of the disease.

18

109.    This community spread is not or will not be limited to the Plant. Infected workers will go home to interact with their families and with other members of the public as they undertake their day-to-day activities, like grocery shopping.

110.    Thus, increased community spread at the Plant will cause increased community spread in the cities of Milan and Kirksville, Sullivan and Adair Counties, the State of Missouri, and the United States.

111.    This community spread will result in disease and possibly death. It will also stress healthcare resources and cause financial harm.

112.    As a result, Smithfield's current operations constitute a public nuisance because they unreasonably interfere with the common public right to public health.

113.    The public nuisance causes special harm to Jane Doe, RCWA members, and RCWA because they are directly exposed to the dangerous working conditions at the Plant.

114.    Indeed, multiple members of the Plant workforce are currently self-quarantined because of COVID-19 symptoms.

115.    This public nuisance causes special harm to Jane Doe because of the risks she will be exposed to at work or in the community, requiring her to quarantine, losing income, and putting anyone she may come into close contact with at risk.

116.    This public nuisance causes special harm to RCWA and puts RCWA at risk of even greater special harm because of the resources it must spend to help its members cope with the nuisance.

117.    Plaintiffs therefore request a declaration that the Plant constitutes a public nuisance and injunctive relief to abate the nuisance.

## COUNT II: BREACH OF DUTY TO PROVIDE A SAFE WORKPLACE AND DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

### (BY JANE DOE AND RCWA AGAINST ALL DEFENDANTS)

118.     Smithfield owes its employees, including Jane Doe and its RCWA member employees, the following duties:

> 1.     The duty to provide a safe place to work.
>
> 2.     The duty to provide safe appliances, tools, and equipment for work.
>
> 3.     The duty to give warning of dangers of which the employee might reasonably be expected to remain in ignorance.
>
> 4.     The duty to provide a sufficient number of suitable fellow servants.
>
> 5.     The duty to promulgate and enforce rules for the conduct of employees which would make the work safe.

119.     By failing to properly implement worker protections during the COVID-19 crisis, Smithfield breached these duties.

120.     Jane Doe and RCWA members have already been harmed as a result of this breach, including emotional harm and in some cases pecuniary harm and physical harm associated with the COVID-19 infection.

121.     Jane Doe and RCWA members are also likely to experience future harm if Smithfield does not immediately satisfy its duties to provide a reasonably safe workplace as a matter of Missouri law.

122.     Jane Doe and RCWA request a declaration that these workplace safety duties are being breached and injunctive relief to ameliorate the breach.

**PLAINTIFFS DO NOT DEMAND A JURY TRIAL**

**PRAYER FOR RELIEF**

123.    Plaintiffs respectfully request an Order from this Court:

    a.    Entering judgment for Plaintiffs and against all Defendants;

    b.    Declaring that Smithfield's failure to implement appropriate worker protections
during the COVID-19 crisis constitutes a public nuisance under Missouri law and
a violation of the right to a safe work place under Missouri law.

    c.    Entering preliminary and final injunctive relief to protect the workers and
community from transmission, including but not limited to:

        i.    Providing sufficient personal protective equipment, including clean masks,
to all individuals who enter the Plant;

        ii.    Creating and implementing a social distancing plan for the Plant that will
allow the workers to stay 6 feet apart to the extent possible, including on
the line;

        iii.    Providing breaks so workers can wash their hands and providing
handwashing stations for them to use;

        iv.    Providing tissues;

        v.    Creating and implementing a protocol to clean surfaces;

        vi.    Altering leave policies to allow workers showing COVID-19 symptoms to
stay home without any form of punishment to their wages or future
prospects and to clearly and conspicuously inform all workers of that plan;

        vii.    Developing and implementing a plan to test workers showing symptoms
and perform contact tracing for those they have been near who could have
been exposed; and

21

viii. Providing a specific date for inspection of the Plant by Plaintiffs'

workplace health and safety experts so they can determine what additional

steps may be required.

Respectfully Submitted,

By: /s/ Gina Chiala
Gina Chiala          #59112
HEARTLAND CENTER
FOR JOBS AND FREEDOM, INC.
4047 Central Street
Kansas City, MO 64111
Telephone:     (816) 278-1092
Facsimile:     (816) 278-5785
Email:  ginachiala@jobsandfreedom.org

David Seligman*
Juno Turner*
Towards Justice
1410 High Street, Suite 300
Denver, CO 80218
Telephone:     (720) 441-2236
Facsimile:     (303) 957-2289
Email: david@towardsjustice.org
Email: juno@towardsjustice.org

David S. Muraskin*
Karla Gilbride*
Stevie K. Glaberson*
Public Justice
1620 L. St, NW, Suite 630
Washington, DC 20036
Telephone:     (202) 797-8600
Facsimile     (202) 232-7203
Email: dmuraskin@publicjustice.net
Email: kgilbride@publicjustice.net
Email: sglaberson@publicjustice.net

***Attorneys for Plaintiffs***

* will move to appear pro hac vice