# Exhibit 6

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| ALASKA STATE EMPLOYEES ASSOCIATION, LOCAL 52, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| STATE OF ALASKA, | ) ) |
| Defendant. | ) ) |
| _____ | ) Case No. 3AN-20-05652CI |

## ORDER REGARDING ASEA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The Alaska State Employees Association, Local 52 ("ASEA") filed this lawsuit along with a *Motion for Temporary Restraining Order and Preliminary Injunction* and a *Motion for Expedited Consideration* on March 24, 2020, requesting the Court order the State of Alaska ("SOA") take specific action to protect its members in relation to the COVID-19 Pandemic. The SOA opposes the *Motion* saying it is already taking the actions demanded by ASEA, and ASEA's request for court action is interfering in the Governor's executive power during a time of unprecedented emergency. The Court expedited briefing, heard Oral Argument on Friday, March 27, and now issues this Order addressing the *Motion for Temporary Restraining Order* ("TRO").

While the Court has no doubt that ASEA members, like all Alaskans, are anxious about their health and safety during this pandemic, ASEA has failed to make the required legal showing necessary to justify a temporary restraining order. Accordingly, the *Motion* for TRO is denied.

## I. INTRODUCTION

In January 2020, the World Health Organization declared the outbreak of the novel coronavirus disease (COVID-19) a public health emergency of international concern. Since that time, COVID-19 has spread rapidly across the globe. On March 11, 2002, the World Health Organization ("WHO") declared a global pandemic. On the

same day, March 11, 202, Governor Dunleavy issued a Declaration of Public Health Disaster Emergency[1] for COVID-19. On March 13, 2020, President Trump declared the outbreak a national emergency for the United States.

In the few short weeks since the WHO declaration of global pandemic, the world has seen unprecedented changes in nearly every corner of the globe and every facet of society. Some states and cities in the United States have been hit particularly hard, while others are watching apprehensively and hoping their hometown isn't the next epicenter. The number of reported cases has grown exponentially. States, Cities, and indeed the entire country seem to be racing to keep up with the ever changing scope of the pandemic.

At the time of the Governor's Declaration (March 11), there were no reported cases of COVID-19 in Alaska. Still, the commissioner of the Alaska Department of Health and Social Services certified it was highly probable an outbreak of COVID-19 would occur in the state in the very near future. The Declaration further stated that the outbreak was expected to impact every community in Alaska and significantly affect the life and health of Alaskans. The virus struck Alaska the very next day.

Since the disaster declaration, the Governor has issued several health mandates, and health alerts. In addition, Cities and Boroughs across Alaska have issued their own declarations, advisories and mandates. The pace and flow of information is dizzying.

There has undoubtedly been a surge of anxiety following the pervasive spread of the virus. Alaskans, like citizens across the world, are worried about their health, their jobs, their families, and what the world will look like when the virus is finally contained.

The following timeline is provided to add perspective to the present disaster emergency, and context for the decision which follows.

## II.   THE COVID-19 CORONAVIRUS

The Following timeline provides milestones in the Covid-19 Pandemic.

---

[1] AS 26.23.020(c).

| | |
|---|---|
| 12/31/2019 | China reports detection of unknown virus to WHO |
| 1/30/2020 | WHO declares the outbreak a Public Health Emergency of International Concern |
| 1/31/2020 | US Secretary of HHS Azar declares Public Health Emergency for US for 2019 Novel Coronavirus |
| 2/12/2020 | UN activates WHO-led crisis management team |
| 3/7/2020 | WHO reports 100,000 cases world-wide of COVID-19 |
| 3/8/2020 | WHO reports 100 countries reporting COVID-19 |
| 3/11/2020 | Governor Dunleavy Declares Public Health Emergency in Alaska |
| 3/13/2020 | Governor's Health Mandate 001<br>Limits visitation at certain facilities<br>Suspends school 3/16-3/30 |
| 3/16/2020 | Governor's Health Mandate 002<br>Closes libraries, archives, museums & residential schools 3/17-3/31 |
| 3/17/2020 | Governor's Health Mandate 003<br>Closes Restaurants, Bars & Entertainment facilities for "dine-in" service 3/18-4/1<br>Exceptions apply<br>Places of public accommodation encouraged to include "social distancing" |
| 3/17/2020 | Governor's Health Mandate 004<br>First travel restrictions / quarantine order |
| 3/19/2020 | Governor's Health Mandate 005<br>Delay in elective or non-urgent medical procedures for 3 months |
| 3/19/2020 | Governor's Health Mandate 006<br>Postpone all elective and non-essential dental procedures.<br>Limit use of PPE to the minimum necessary for emergency care. |
| 3/20/2020 | Governor's Health Mandate 007<br>Limits business / personal care services gatherings in Fairbanks & Ketchikan |
| 3/20/2020 | Governor's Health Mandate 008<br>Closes public & Private schools through 5/1/2020<br>"to limit close contacts (people outside of a family unit) to be farther than six feet from each other |

| 3/20/2020 | Anchorage Mayor Berkowitz Emergency Order to "Hunker Down" (EO3) |
|---|---|
| 3/23/2020 | Governor's Health Mandate 009<br>Statewide limit on personal care services and gatherings<br>"All business . . . or gatherings in the State of Alaska, where individuals are within 6 feet of each other <u>must stop all operations.</u> |
| 3/24/2020 | Governor's Health Mandate 010<br>All arriving persons must self-quarantine for 14 days<br>Arrivers should work from home unless you "support critical infrastructure." |
| 3/27/2020 | Anchorage Mayor Berkowitz Extends Emergency Orders EO-1 (Restrictions & Closures) and EO-3 (Hunker Down) to April 14 |
| 3/27/2020 | Governor's Health Mandate 011 – Social Distancing<br>All persons in Alaska, except for those engaged in essential health care services, *public government services*, and essential business activities, are mandated to remain at their place of residence and practice social distancing. |
| 3/27/2020 | Governor's Health Mandate 012 – Intrastate Travel<br>Statewide limit on travel between communities except for critical infrastructure or critical personal needs. |

## III.   ARGUMENTS

### A.  Alaska State Employees Association, Local 52

ASEA's Complaint in this case alleges the State has failed to provide a safe work environment in violation of its Collective Bargaining Agreement, and Alaska law, including AS 18.60.075. More specifically, Plaintiff ASEA argues the SOA is violating its own social distancing and precautionary standards in light of the new Coronavirus COVID-19 pandemic. ASEA contends that SOA is failing to comply with its own facility closure policy, is not permitting employees of any class to change or stagger shifts to maximize social distancing, to reassign employees to different locations in need of additional staffing or to maximize social distance, and is failing to train employees to ensure appropriate coverage. ASEA argues that SOA should be required to modify work spaces for members so that it complies with its own policies to ensure that ASEA members have adequate space and distance between themselves and other ASEA members.

## B. State of Alaska Response

The State counters that ASEA is attempting to dictate what ASEA deems to be the most appropriate working conditions for thousands of state employees in the face of an evolving emergency where the circumstances will have changed in the time it takes to issue a new mandate. The State further argues that it is moving aggressively to implement changes in working conditions, telecommuting rules, and other measures as rapidly as possible in the face of an unprecedented pandemic, but that ASEA's proposed order needlessly ties the State's hands in responding to the crisis. "It takes critical workplace and personnel decisions away from the officials who are most familiar with the work employees perform and the manner in which they can safely perform it."[2] The State further argues that ASEA's request invites the court to "trample upon separation of powers" by injecting the court into the governor's authority to oversee and make decisions about how best to manage a public health crisis.

## IV.     LEGAL FRAMEWORK
### A. The Governor's Disaster Authority

Under Alaska law, the responsibility for handling disasters rests with the governor. The governor "is responsible for meeting the dangers presented by disaster to the state and its people."[3] Under the Alaska Disaster Act, the legislature made clear that its purpose was "to clarify and strengthen" the role of the governor in responding to disasters.[4] If the governor finds that a disaster has occurred, or that one is imminent or threatened, then the governor shall declare a condition of disaster emergency.[5] In responding to a disaster, the governor has broad power to issue orders, and regulations necessary address the disaster.[6] Similarly, the governor has the power to suspend orders and regulations if necessary to address the disaster.[7] The governor's power is

---

[2] State's Opposition to Motion for TRO & Preliminary Injunction at 2-3.
[3] AS 26.23.020(a).
[4] AS 26.23.010(4).
[5] AS 26.23.020(c).
[6] AS 26.23.020(b).
[7] AS 26.23.020(g)(1).

not unchecked, however. A governor's proclamation of disaster emergency may not remain in effect longer than 30 days unless extended by the legislature.[8]

In addition to these general powers, the governor is granted certain enumerated powers in the event of a disaster declaration. These include the power to:[9]

1) Suspend the provisions of any regulatory statute prescribing procedures for the conduct of state business, or the orders or regulations of any state agency if compliance would otherwise prevent, substantially impede or delay action necessary to cope with the disaster emergency;

2) Use all available resources of state government;

3) Transfer personnel or alter the functions of state departments and agencies or units;

4) Commandeer private property if necessary;

5) Direct relocation of all or party of the population if necessary for the preservation of life or for other disaster mitigation purpose;

6) Prescribe routes, modes of transportation and destinations in connection with relocation;

7) Control ingress and egress from a disaster are, the movement of persons within the area, and the occupancy of premises in it;

. . .
10) Allocate or redistribute food, water, fuel, clothing, medicine, or supplies; . . . .

If the disaster declared by the governor is due to an outbreak of disease, or a credible threat of an imminent outbreak of disease, the department of health and human services is specifically granted additional emergency powers.[10]

## B. Separation of Powers

The State challenges ASEA's request for a temporary restraining order in part based upon the separation of powers doctrine. Fundamentally, the separation of

---

[8] AS 26.23.020(c). As of this writing, SB 241, a bill extending the Governor's disaster authority until November 15, 2020, has been passed by the Alaska legislature and is awaiting transmittal to the Governor.
[9] AS 26.23.020(9) (list is paraphrased).
[10] AS 18.15.390.

powers and its complementary doctrine of checks and balances are part of the constitutional framework of this state and of the United States.[11] Under the Constitution, power is vested in three equal branches of government.[12] The Alaska Constitution vests legislative power in the legislature; executive power in the governor; and judicial power in the courts.[13] The separation of powers doctrine limits the authority of each branch to interfere in the powers that have been delegated to the other branches.[14] Among the purposes of the separation of powers doctrine are safeguard the independence of each branch of government.[15] However, that independence is not unchecked.[16]

The Governor's executive power is laid out in Article III of the Alaska Constitution:

> The governor shall be responsible for the faithful execution of the laws. He may, by appropriate court action or proceeding brought in the name of the State, enforce compliance with any constitutional or legislative mandate, or restrain violation of any constitutional or legislative power, duty, or right by any officer, department, or agency of the State or any of its political subdivisions. This authority shall not be construed to authorize any action or proceeding against the legislature.[17]

This power is further delineated in Section 22, describing the Executive Branch:

> All executive and administrative offices, departments, and agencies of the state government and their respective functions, powers, and duties shall be allocated by law among and within not more than twenty principal departments, so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may be

---

[11] *Alaska Public Interest Research Group v State*, 167 P.3d 27, 35 (Alaska 2007);
[12] *Bradner v. Hammond*, 553 P.2d 1, 5 (Alaska 1976).
[13] I, 553 P2d at 6.
[14] *AKPIRG*, 167 P3d at 35; *See* also *Abood v. League of Women Voters*, 743 P.2d 333, 338 (Alaska 1987).
[15] A*KPIRG*, 167 P3d at 35; *See* also Bradner, 553 P2d at 6.
[16] *Bradner*, 553 P2d at 6-7. (A problem inherent in applying the doctrine of 'separation of powers' stems from the fact that the doctrine is descriptive of only one facet of American government. The complementary doctrine of checks and balances must of necessity be considered in determining the scope of the doctrine of separation of powers.)
[17] Alaska Constitution, Article. III, §16.

established by law and need not be allocated within a principal department.[18]

The governor is also given the power to make changes in the organization of the executive branch, or within its units which the governor considers necessary for efficient administration.[19]

## C. Safe Work Environment

Under the General Safety Code, an employer (including the State) must do "everything necessary to protect the life, health, and safety of employees.[20] That duty specifically includes complying with occupational safety, adopting and prescribing "suitable protective equipment, safety devices, and safeguards as are prescribed for the workplace," adopting procedures that prevent an employee from being exposed to hazards, and furnishing an employee a place of employment free from recognized hazards.[21]

The Alaska Department of Labor is charged with enforcing the general standards,[22] and adopting regulations to carry out the purposes of the code.[23] Employers are permitted to apply for a variance from safety and health standards upon showing that the employer's conditions, practices, means, methods, operations, or processes used or proposed will provide employees with as safe and healthful an environment as compliance would yield.[24] In addition, an employer may apply for a temporary variance: 1) if it is unable to comply because of unavailability of technical personnel or materials and equipment needed, or because alteration of facilities cannot be completed by the effective date; 2) the employer is taking all available steps to

---

[18] Alaska Constitution, Article. III, §22.
[19] Alaska Constitution, Article. III, §23.
[20] AS 18.60.075(a).
[21] AS 18.60.075(a)(1) – (4).
[22] AS 18.60.030.
[23] AS 18.60.020.
[24] AS 18.60.077.

Case 5:20-cv-06063-DGK   Document 29-6   Filed 04/27/20   Page 9 of 21

safeguard employees against the hazards; and 3) it has an effective program for coming into compliance as quickly as practicable.[25]

### D. The Collective Bargaining Agreement

Alaska's Public Employment Relations Act ("PERA")[26] establishes a system of union representation for state employees. Under PERA, a majority of employees in a bargaining unit may, if they choose, select a union representative to negotiate and oversee a collective bargaining agreement for their unit.[27] The Alaska State Employees Association ("ASEA") is a labor organization serving as the collective bargaining representative of a General Government Bargaining Unit, consisting of approximately 8,000 State employees.[28] Those members are classified according to state statute.[29]

The State and ASEA entered into a Collective Bargaining Agreement for the period July 1, 2019 through June 30, 2022.[30] The CBA contains certain provisions pertinent to the present case. Article 29, as both parties acknowledge, requires an employer to comply with the Division of Labor Standards and Safety Regulations.[31] Article 4 recognizes an employer retains the right to manage its affairs and direct the work force except as otherwise provided for in the CBA.[32] This article lists specific examples, such as an employer's right to assign and direct work, designate duty stations and assign personnel to those duty stations, reduce the work force due to a cause consistent with efficient management, alter its operations, establish reasonable work rules, and assign personnel to shifts of its designation.[33] Consistent with Article 4, Article 27 provides that the hours of operation and shift assignments are made by the

---

[25] AS 18.60.081(a).
[26] AS 23.40.070-.230.
[27] AS 23.40.080- 100.
[28] Complaint at para. 1.
[29] AS 23.40.200.
[30] Complaint at p. 13, n 52.
[31] CBA art. 29.01.
[32] CBA art. 4.
[33] CBA art. 4.

employer and in accordance with the needs of the employer.[34]  Lastly, the grievance procedures articulated in Article 16 are implicated.[35]

### E. Injunctive Relief – Temporary Restraining Order

A plaintiff may obtain a preliminary injunction or a TRO by meeting either the balance of the hardships or the probable success on the merits standard.[36]  The balance of hardships standard requires balancing the harm the plaintiff will suffer without the injunction against the harm the injunction would impose on the defendant.[37] An injunction under this standard is warranted when three factors are present: (1) the plaintiff must be faced with irreparable harm; (2) the opposing party must be adequately protected; and (3) the plaintiff must raise serious and substantial questions going to the merits of the case; that is, the issues raised cannot be frivolous or obviously without merit.[38]

Accordingly, the balance of hardships standard applies where the injury which would result from the requested relief can be indemnified or where it is relatively slight in comparison to the injury which the person seeking the injunction will suffer if the injunction is not granted.[39]  On the other hand, where the plaintiff's threatened harm is less than irreparable or if the opposing party cannot be adequately protected, then the plaintiff must meet the heightened showing of probable success on the merits.[40]

## V.    DISCUSSION

Against the backdrop of an unprecedented public health crisis, this Court must decide whether to grant injunctive relief to ASEA.  At the outset, it is worth noting that ASEA requested this Court issue a temporary restraining order within 24 hours of filing its complaint.  ASEA's complaint in this case was filed less than 24 hours after the

---

[34] CBA art 27.
[35] CBA art 16.
[36] *Alsworth v. Seybert*, 323 P.3d 47, 54-55 (Alaska 2014).
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *State, Div. of Elections v Metcalfe*, 110 P.3d 976, 978 (Alaska 2005); *State v Kluti Kaah Native Village of Copper Ctr.*, 831 P.2d 1270, 1272-73 (Alaska 1992).

Governor issued Health Mandates 9 and 10 restricting gatherings on a statewide basis, and providing for social distancing. The Court granted expedited consideration and set an extraordinarily aggressive briefing schedule given the issues involved. This decision is therefore made on the request for a temporary restraining order only, and does not address the broader request for a preliminary injunction.

As noted above, a party may obtain a TRO or preliminary injunction by meeting either the balance of hardships test or the probable success on the merits standard.[41] Both parties recognize that different standards exist, but they do not agree on which standard the court should apply. ASEA implicitly argues for application of the balance of hardships test. By contrast, the State is more explicit in arguing that ASEA must meet the probable success on the merits standard. Under the circumstances of this case, ASEA must meet the probable success on the merits standard.

### A. Will ASEA Suffer Irreparable Harm if the TRO is not Granted?

ASEA argues "there can be no question that the ASEA members face irreparable harm. "The *potential harms* facing ASEA members are the same harms that the other Alaska and U.S. citizens face, leading federal, state and local officials to issue serious and dire warnings, and restrict travel and other personal freedoms."[42] Further, ASEA's Complaint alleges the State is causing ASEA to suffer irreparable harm:

> By failing to provide a safe work environment, and by failing to follow the procedures the Defendant adopted, announced and promised State employees, the Defendant is seriously harming ASEA members. The harm is varied, and includes the failure to allow telecommuting agreements, the failure to treat ASEA members with dignity and respect, the failure to modify work spaces and schedules, the failure to adequately protect employees from exposed hazards, and failure to provide adequate PPE. These harms are occurring, and expose ASEA members to serious health risks. These harms will increase so long as the Defendant is not enjoined from its continued practice.[43]

---

[41] *Alsworth*, 323 P.3d at 54-55.

[42] ASEA Motion for TRO at p.5 (emphasis added).

[43] ASEA Complaint at para. 24.

The State responds that ASEA has not shown *irreparable harm* because it is already implementing the policies that ASEA wants enforced without an injunction. At oral argument, the State's counsel indicated that the telecommuting policy has been relaxed and expanded greatly the opportunities for many State employees to work from home.[44] It also notes that managers are currently working to change shifts, stagger work schedules, and modify workspaces as rapidly as possible. And, perhaps most importantly, the State intends to continue its process to implement changes to assure the safety of its employees even if an injunction is not granted.[45]

In addition, the State argues that no evidence has been submitted by ASEA that the proposed TRO would meaningfully alter the risk of exposure to COVID-19 for ASEA members as compared with others working in critical private businesses. "[T]he State cannot eliminate all risk if it is to continue operating, as it must in order to provide essential services to Alaskans. . ...."[46] Finally, the State argues that "ASEA's allegations, concerning any number of its roughly 8,000 members, are too vague and conclusory to meaningful evaluate the nature of the harm and the risks on an individual level."[47]

This Court has no doubt that ASEA's members are anxious, and frightened. But, it also appears that ASEA's major complaint is the State is simply not moving fast enough to implement protective measures for its workforce. Asked about this point at oral argument, ASEA's counsel pointed to the timing provided in Governor's Ninth Health Mandate – that it was to take effect at 5pm the day after it was issued.[48] It is true the language of the mandate expressed that "all businesses, congregations, or gatherings in the State of Alaska, where individuals are within six feet of each other <u>must stop all operations</u>."[49]

---

[44] Counsel indicated the number of employees being allowed to telecommute had increased by 12% in just the previous 48 hours.
[45] State's Opposition to Motion for TRO at p. 9.
[46] State's Opposition to Motion for TRO at p. 10.
[47] State's Opposition to Motion for TRO at p. 10.
[48] See Governor's COVID-19 Health Mandate 9.1 dated March 23, 2020, effective March 24, 2020 at 5pm.
[49] *Id.*

Case 5:20-cv-06063-DGK   Document 29-6   Filed 04/27/20   Page 13 of 21

But the Health Mandates must also be read in conjunction with the explanatory notes or communications which accompany the mandates. Certain businesses and industries are considered essential, and must keep operating during the emergency.[50]

The majority of the points raised by ASEA argue the State is not following its own guidelines, and it is therefore putting its members at risk.[51] It is easy to understand from the employees' perspective that they may question why their individual situation cannot be accommodated. Why can't I do my job from home and telecommute? If I can't work from home, why can't my desk be moved, or my shift changed, or why can't I have greater access to personal protective equipment if I have to deal with the public? All of these are natural questions from the standpoint of an individual employee. For the managers and department heads that have to address several thousand similar requests in the face of rapidly changing circumstances on a daily basis, the issues are far more daunting. As some have described it, the situation is like trying to fly an airplane at the same time you're building it.

The core question is whether ASEA will suffer irreparable harm if the injunction is denied, not whether ASEA members are exposed to risk from COVID-19 if they come to work. In this respect, the State's argument that it is already implementing the steps ASEA seeks and will continue to do so even if injunctive relief is denied is persuasive. Moreover, ASEA's claim of harm must be balanced against the potential harm to the State if the injunction is granted.

---

[50] The Frequently Asked Questions about the COVID-19 Health Mandates ("FAQ") explains what businesses (including the State) which are allowed to continue operating. The FAQ expressly notes that the mandate does not apply to critical infrastructure industries as outlined in the Attachment A – Alaska Critical Workforce Infrastructure. That attachment in turn identifies that Essential Government Functions" are part of the critical workforce infrastructure. Many other businesses and industries are also identified.

[51] It is worth noting the US Supreme Court has stated that a possible unsafe work environment might be considered in evaluating a claim of irreparable harm. But, whether or not a work environment is unsafe depends on the facts, including whether or not the threat is concrete and particularized. It must be actual and imminent, as opposed to conjectural or hypothetical. See Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ("To seek injunctive relief, a plaintiff must show that he is under threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.")

**B. Is the State adequately protected?**

ASEA argues the State cannot be harmed if it is simply ordered to follow the policies it designed and implemented.[52] The State counters that the proposed injunction would interfere with the State's role of protecting the health and safety of all Alaskans, not just ASEA members.[53] As the State points out, the inquiry under the balance of hardship test is not simply whether the injunction orders the defendant to comply with the law.[54] Instead, the balance seeks to determine whether the harm to the defendant is relatively slight if the injunction is granted, when compared to the injury the plaintiff will suffer if the injunction is not granted.[55]

In this case, the State argues it cannot be protected because the proposed injunction will stymie the State's ability to manage essential government services during the pandemic. The state must allocate scarce resources (for example personal protective equipment) in the face of a rapidly changing crisis. It must also allocate time, effort, and materials to implement changes in varying degrees in different departments. Personnel managers and department heads must be given some degree of flexibility and latitude in making changes, particularly in the context of a disaster emergency.

In fact, as will be discussed further below, the State's argument for flexibility is bolstered by the specific designation of Alaska Critical Workforce Infrastructure in the Governor's Mandates.[56]

> Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have special responsibilities in these times to continue operations.[57]

As further noted in the explanatory attachment,

---

[52] ASEA Motion for TRO at p. 6.
[53] State's Opposition at p 10.
[54] State's Opposition at p 11.
[55] *Alsworth*, 323 P.3d at 55.
[56] *See* Health Mandate 010 Attachment A dated March 23, 2020.
[57] *Id.*

Individuals providing "Essential Governmental Functions" are critical. "Essential Government Functions" means all services needed to ensure the continuing operation of government agencies and provide for the health, safety, and welfare of the public.[58]

In this Court's view, ASEA's argument that its members are suffering irreparable harm, and the State's argument that its interests are not adequately protected if the injunction is granted must both be evaluated in the context of the Governor's designation that essential government services are part of Alaska's critical workforce infrastructure.

ASEA suggests in its Reply that the State has improperly classified "all employees as essential, contradicting the employee class distinctions in AS 23.40.220."[59] But ASEA has not asked this Court to declare the State's determination of essential employee status invalid. In the Court's view, this type of determination, whether right or wrong, is precisely the kind decision which is delegated to the executive under the Alaska Disaster Act.[60]

The Governor is tasked with responding to disasters, including public health emergencies. The legislature already decided in passing the Alaska Disaster Act that the Governor should have greater power and flexibility in times of emergency.[61] The proposed TRO will not have a slight impact on the State's ability to manage the disaster. Instead, it attempts to dictate the timing and scope of the daily decisions required of the Supervisors and managers when the Governor has previously declared that a functioning critical infrastructure is imperative in this crisis, and that includes all services needed to ensure the continuing operation of government agencies. The impact and potential harm to these essential operations is by no means slight in comparison to the potential harm to ASEA members if the injunction is denied.

---

[58] *Id.* paragraph e.
[59] ASEA's Reply in Support of Mot. For TRO at p6.
[60] See AS 26.23.020(g)(2) and (3).
[61] AS 26.23.010(4).

## C. Serious and Substantial Questions / Probable Success on the Merits

ASEA acknowledges that it must at least demonstrate "serious and substantial questions going to the merits of the case."[62]  The State argues that ASEA must meet the higher standard of "probable success on the merits."  Both standards require the Court to evaluate the merits of ASEA's claim.

Because the State's interests cannot be adequately protected if the TRO is granted, ASEA must meet the higher standard of "probable success" on the merits.[63]

The Complaint in this case alleges a single count: that the State is violating the general safety code and the collective bargaining agreement requirement to provide safe working conditions.

Without question, the situation now faced by State workers, and indeed all citizens of Alaska is unprecedented.  Never before in this Court's experience have circumstances changed so rapidly.  In the brief interlude between the time the parties argued this case last Friday, and the time this order is issued, both the Governor of Alaska, and the President have issued new orders affecting individual liberties, the movement of people, the allocation of scarce resources, and a multitude of other concerns.[64]  Before the ink is dry on this order, things will have changed again.

No doubt, ASEA will view these latest events as further justification for why the State should follow its own policies, and guidelines.  Just as forcefully, the State will argue these developments reinforce the State's need to let state officials make the appropriate personnel decisions and workplace changes.

In this Court's view, ASEA's argument fundamentally fails to address the impact of the Governor's Disaster declaration.  In times of declared disaster, including a public health emergency, the governor "is responsible for meeting the dangers presented by

---

[62] UCIDA, 815 P.2d at 378-379.

[63] *State v United Cook Inlet Drift Ass'n*, 815 P.2d 378, 379 (Alaska 1991).

[64] *See* eg Governor's Health Mandate 11 (Social Distancing), and Health Mandate 12 (Intrastate Travel), both dated March 27, 2020.

disaster to the state and its people."[65]  In responding to a disaster, the governor has broad power to issue orders, and regulations necessary address the disaster.[66]  Among the specific power granted during a disaster, the Governor may suspend the provisions of any regulatory statute prescribing procedures for the conduct of state business, or the orders or regulations of any state agency if compliance would otherwise prevent, substantially impede or delay action necessary to cope with the disaster emergency.[67] He may also transfer personnel or alter the functions of state departments and agencies or units.[68]  The Governor may also direct and compel the relocation of people, control ingress and egress from a "disaster area", and the movement of persons within the area, and occupancy of premises.[69]

ASEA's argument that the State is not following the Governor's mandates must be considered in view of the Governor's extremely broad delegation of power to manage a disaster, including a public health crisis.  Viewed in that light, the State's separation of powers argument is persuasive.  Particularly in times of crisis, the executive branch must be afforded deference to do its job in a manner that promotes the health, welfare and safety of all Alaskans.  In effect, ASEA is inviting this Court to substitute its judgment for the expertise of State officials who are charged with managing several thousand workers.

That is not to say that ASEA's claims necessarily lack merit.  ASEA offers anecdotal evidence of complaints by members that the State is acting arbitrarily in the implementation of its telecommuting policy.[70]  It also offers photos showing cubicles in some state office location that are closer than six feet.  The State may be able to take more steps to implement social distancing, or to avoid gatherings of 10 or more workers.  If true, these allegations may give rise to appropriate grievances under the CBA.  Depending upon the particular circumstances of a specific worksite, there may be a work environment which would be deemed unsafe.  But what ASEA argues for is a

---

[65] AS 26.23.020(a).
[66] AS 26.23.020(b).
[67] AS 26.23.020(9)(1).
[68] AS 26.23.020(9)(3).
[69] AS 26.23.020(9)(5) and (7).
[70] At oral argument, the State's counsel indicated that workers who disagreed with a manager's decision on telecommuting could certainly ask for a redetermination, or submit a new request.

wholesale injunction ordering the State to "follow its policies" without regard to the Governor's declaration that Individuals providing "Essential Governmental Functions" are critical.

But here, where ASEA has only just started the grievance process under the collective bargaining agreement, not had the Department of Labor ("DOLWD") investigate claims, and where there is only little anecdotal evidence of the State violating the new COVID-19 policies and mandates, ASEA has likely not shown "probable success on the merits." With the evidence currently presented in the record, it is not at all clear if the State is "probably" violating AS 18.60.075. ASEA has not shown probable success in its claim that the State is not complying with occupational safety and health standards and regulations;[71] that the State is not furnishing suitable protective equipment and safeguards;[72] that the State is not adopting control procedures and monitoring employee exposure with hazards;[73] or that the State is failing to furnish a place of employment free from hazards.[74] Additionally, there is no evidence of the DOLWD finding any ASEA employee work environments are "unsafe," within the meaning of Article 29 of the CBA. That is not to say that ASEA does not raise serious concerns; only that it has not demonstrated *probable* success on the merits.

The Court acknowledges that ASEA claims it is simply asking for a "status quo" injunction – to require the State to follow the law and its own policies. But, maintaining the status quo may not be at all appropriate when faced with a pandemic of unprecedented magnitude. The State's argument on the separation of powers is persuasive.

The Governor and State officials have been tasked with managing this crisis.[75] These officials are charged with the responsibility to make judgments about how (and how quickly) the state can implement executive guidance to protect employees while still continuing to provide vital governmental services. Individually, they are familiar with

---

[71] AS 18.0.075(a)(1).
[72] AS 18.0.075(a)(2).
[73] AS 18.0.075(a)(3).
[74] AS 18.0.075(a)(4).
[75] AS 26.23.020.

Case 5:20-cv-06063-DGK   Document 29-6   Filed 04/27/20   Page 19 of 21

the resources available to each different department, division, section, and employee, and with the suitability and availability of different options to protect the employees and continue to serve the public. "These decisions require and benefit from a thorough understanding of government operations and how they are carried out at each level, in each office, and what impacts or consequences will flow from making those changes."[76] Undoubtedly, many factors go into making these decisions when it comes to any individual's job, or worksite, and managers must balance the relative risks and consequences of making them. [77]

The COVID-19 crisis is a rapidly evolving emergency, unprecedented in scope. The executive branch has the unenviable, but duly appointed task of managing this disaster. On the record as it currently exists, ASEA has not shown that it is likely to succeed on the merits. Even under the lesser standard of "serious and substantial questions going to the merits," the Court is not currently persuaded.[78] In light of the great risk of harm to the State a TRO would pose, this is not an appropriate case for a temporary restraining order.

## VI. ORDER

ASEA moved on an expedited basis for a temporary restraining order and for a preliminary injunction. For the reasons outlined herein, the *Motion for Temporary Restraining Order* is DENIED.

The parties shall meet and confer (by telephone) in the next five days and address what further proceedings are desired in light of this order.

---

[76] State Opposition at p.5.

[77] For example, at argument, the State's counsel indicated that telecommuting implicates the State's web security protocols, the need to provide computer resources to employees so they can work at home, and the individual need to retrofit an individual workstation / computer so that a particular employee can access the appropriate files from a remote location. Multiplied by several thousand employees, the task is daunting.

[78] This decision today is limited to the request for a Temporary Restraining Order. Given the limited record before the Court and the expedited briefing schedule set by the Court last week, the Court is not foreclosing a preliminary injunction if the parties request such a hearing. However, before granting such a request, the Court would need to first determine whether such a hearing is procedurally appropriate in light of the grievance which was apparently filed by ASEA at the same time as this lawsuit was commenced.

A telephonic status / pretrial conference will be held at 3pm on April 6.

**IT IS SO ORDERED.**

DATED at Anchorage, Alaska this 31st day of March, 2020.

Thomas A. Matthews
Superior Court Judge

I certify that on 3/31/20 a copy of the above
was emailed to each of the following:

*Molly Brown*
*Kevin Higgins*

Judicial Assistant