**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI**

RURAL COMMUNITY WORKERS ALLIANCE
and JANE DOE,

               Plaintiffs,

    vs.

SMITHFIELD FOODS, INC. and SMITHFIELD
FRESH MEATS CORP.,

               Defendants.

C. A. No.  5:20-cv-06063-DGK

---

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.   Background ........................................................................................................... 1

II.  Facts ................................................................................................................... 2

    A.    Smithfield and the Plant ....................................................................... 2

    B.    Plaintiffs' Complaint ............................................................................ 4

    C.    Smithfield's COVID-19 Safety Procedures ......................................... 5

    D.    The OSHA Request for Information ..................................................... 13

    E.    OSHA's Role ....................................................................................... 14

    F.    State and Local Public Health Authorities ........................................... 15

    G.    Public Health Inspection of the Plant ................................................... 17

III.  Argument .......................................................................................................... 17

    A.    Plaintiffs Do Not Have A Likelihood of Success on the Merits ........... 18

        1.    Plaintiffs are not likely to succeed on their public nuisance claim ........... 19

        2.    Plaintiffs are not likely to succeed on their claim for breach of the duty to provide a safe place to work ......................................................... 21

    B.    Plaintiffs have not demonstrated a threat of irreparable harm .............. 24

        1.    Plaintiffs have shown no actual harm or threat of harm ......................... 24

        2.    Plaintiffs rely on past conduct—rather than current conditions ............... 25

        3.    Plaintiffs have an adequate remedy at law .............................................. 26

    C.    The Balance of Harms Does Not Support Injunctive Relief ................. 27

    D.    Strong Public Policy Reasons Exist To Deny the Requested Injunction .............. 28

    E.    The Requested Injunction Is Overreaching and Improper ................... 30

IV.  Conclusion ....................................................................................................... 32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**OTHER CASES**

*44 Plaza, Inc. v. Gray-Pac Land Co.*
   845 S.W.2d 576 (Mo. App. E. Dist. 1992) ...........................................................................20

*AARP v. EEOC*
   226 F. Supp. 3d 7 (D.D.C. 2016) ..........................................................................................18

*Alaska State Employees Ass'n, Local 52 v. State of Alaska*
   Case No. 3AN-20-05652CI (Alaska Sup. Ct. April 27, 2020) ..............................21, 25, 27, 32

*American Ass'n of Orthodontists v. Yellow Book USA, Inc.*
   277 S.W.2d 686 (Mo. Ct. App. E.D. 2008) ........................................................................26

*Arkansas Ed. Ass'n v. Bd. of Ed. of Portland, Ark. Sch. Dist.*
   446 F.2d 763 (8th Cir. 1971) ................................................................................................25

*Ashcroft v. Kansas City Firefighters Local No. 42*
   672 S.W.2d 99 (Mo. App. 1984) ..........................................................................................20

*Baxley v. Jividen*
   2020 WL 1802935 (S.D. W. Va. Apr. 8, 2020)................................................................29, 32

*Bricklayers, Masons, Marble & Tile Setters, Protective & Benevolent Union No. 7*
   *of Neb. v. Lueder Constr. Co.*
   346 F. Supp. 558 (D. Neb. 1972) ..........................................................................................17

*Califano v. Yamasaki*
   442 U.S. 682 (1979)...............................................................................................................30

*Calvin Klein Cosmetics Corp. v. Lenox Lab.*
   815 F.2d 500 (8th Cir. 1987) ................................................................................................17

*CDI Energy Servs. v. West River Pumps, Inc.*
   567 F.3d 398 (8th Cir. 2008) ................................................................................................23

*Chlorine Inst., Inc. v. Soo Line R.R.*
   729 F.3d 903 (8th Cir. 2015) ................................................................................................24

*Citizens for a Strong Ohio v. Marsh*
   123 Fed. Appx. 630 (6th Cir. 2005).......................................................................................18

*Dataphase Sys., Inc. v. C.L. Sys., Inc.*
   640 F.2d 109 (8th Cir. 1981) ................................................................................................17

Case 5:20-cv-06063-DGK   Document 32   Filed 04/29/20   Page 3 of 40

*Dawson v. Asher*
  2020 WL 1704324 (W.D. Wash. Apr. 8, 2020)..............................................................24, 25

*Frank B. Hall & Co. v. Alexander & Alexander, Inc.*
  974 F.2d 1020 (8th Cir. 1992) ..............................................................................................27

*Gade v. National Solid Wastes Management Ass'n*
  505 U.S. 88 (1992)..................................................................................................................23

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers*
  415 U.S. 423 (1974)................................................................................................................30

*Grasso Enterprises, LLC v. Express Scripts, Inc.*
  809 F.3d 1033 (8th Cir. 2016) ..........................................................................................24, 26

*Group Health Plan, Inc. v. Philip Morris, Inc.*
  86 F. Supp. 2d 912 (D. Minn. 2000)....................................................................................18

*Hamilton v. Palm*
  621 F.3d 816 (8th Cir. 2010) ...............................................................................................21

*Heartland Acad. Cmty. Church v. Waddle*
  335 F.3d 684 (8th Cir. 2003) ...............................................................................................19

*Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*
  564 F.2d 816 (8th Cir. 1977) ...............................................................................................30

*Hudson v. School Dist. of Kansas City*
  578 S.W.2d 301 (Mo. App. 1979) ........................................................................................17

*Lemon v. Kurtzman*
  411 U.S. 192 (1973) (plurality opinion) ................................................................................31

*Lexington Healthcare Center of Bloomingdale, Inc. v. Morrison Management
  Specialists, Inc.*
  2020 WL 1820522 (N.D. Ill. Apr. 10, 2020) .........................................................................28

*Liuksila v. Turner*
  2018 WL 6621339 (D.D.C. Dec. 18, 2018)............................................................................29

*Missouri Protection & Advocacy Servs., Inc. v. Carnahan*
  499 F.3d 803 (8th Cir. 2007) ...............................................................................................18

*Noodles Dev., LP v. Ninth Street Partners, LLP*
  507 F. Supp. 2d 1030 (E.D. Mo. 2007)..........................................................................25, 27

*Parr v. Breeden*
  489 S.W.3d 774 (Mo. 2016) ..................................................................................................21

*Planned Parenthood of Minn., N.D., S.D. v. Rounds*
    530 F.3d 724 (8th Cir. 2008) ...............................................18

*Pomeroy, Inc. v. Border Opportunity Saver Systems, Inc.*
    2010 WL 11652127 (W.D. Tex. Feb. 23, 2010) ......................29

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Disc.*
    696 F.3d 771 (8th Cir. 2012) ...............................................24

*Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*
    997 F.2d 484 (8th Cir. 1993) ...............................................18

*Schenck v. Pro-Choice Network of W. N.Y.*
    519 U.S. 357 (1997) ...........................................................30

*Smith v. Western Elec. Co.*
    643 S.W.2d 10 (Mo. App. E. District 1983) ....................22, 23

*Sprint Spectrum L.P. v. AT&T Corp.*
    168 F.Supp.2d 1095 (W.D. Mo. 2001) ..................................29

*State ex rel. Schmitt v. Henson*
    ED 107970, 2020 WL 1862001 (Mo. Ct. App. April 14, 2020) ...........19

*State ex. rel St. Charles County v. Samuelson*
    730 S.W.2d 607 (Mo. App. 1987) .........................................18

*T.S.H. v. Northwest Missouri University*
    2019 WL 5057586 (W.D. Mo. 2019) ....................................18

*U.S. v. N.Y. City Housing Auth.*
    347 F. Supp. 3d 182 (S.D.N.Y. 2018) ...................................29

*Valentine v. Collier*
    __ F.3d __, 2020 WL 1934431 (5th Cir. Apr. 22, 2020) ...........25, 28

*W.G.A. v. Priority Pharmacy, Inc.*
    184 F.R.D. 616 (E.D. Mo. 1999) .........................................18

*W.N.J. v. Yocumi*
    257 F.3d 1171 (10th Cir. 2001) ...........................................18

*Wash. Legal Found. v. Leavitt*
    477 F. Supp. 2d 202 (D.D.C. 2007) ......................................18

*Zoll Circulation, Inc. v. Elan Medizintechnik, GMBH*
    2010 WL 2991390 (C.D. Cal. July 26, 2010) .........................29

iv

**STATUTES**

29 U.S.C. § 651 ...................................................................................................................14

29 U.S.C. § 653(b) ...............................................................................................................23

Mo. Rev. Stat. Ann. § 192.005 ............................................................................................16

Mo. Rev. Stat. Ann. § 192.290 ............................................................................................15

**OTHER AUTHORITIES**

29 CFR 1910 .........................................................................................................................23

# I. BACKGROUND

Plaintiffs ask this Court to take over Smithfield's COVID-19 safety program at the Plant. This request is both unprecedented and unwarranted. Indeed, the Executive Order issued by President Trump on Tuesday, April 28, 2020, invoking the Defense Production Act and ordering meat processing plants to stay open, effectively ends this lawsuit. The President delegated to the Secretary of Agriculture all authority to ensure that meat processors "continue operations consistent with the guidance for their operations jointly issued by the CDC and OSHA." This case should be immediately dismissed.

However, even without that Executive Order, Plaintiffs' request fails on both the facts and the law. The overwhelming evidence demonstrates that Smithfield is in full compliance with OSHA and CDC guidance. This is made clear by the detailed Declaration from the Plant Manager outlining the substantial safety policies and procedures that have been implemented at the Plant, and by the Declaration of former OSHA Director, John Henshaw, in which he expresses his opinion that the Plant's COVID-19 policies and procedures are consistent with the guidance issued by OSHA and the CDC. Plaintiffs' assertions to the contrary are based on speculation, hearsay, anonymous declarations, and outdated information.

Moreover, federal and state agencies are actively involved in reviewing the Plant's work practices and inspecting the facility. OSHA—through a "Rapid Response Investigation"—has requested that Smithfield provide it with comprehensive information regarding its COVID-19 policies and procedures and infections at the Plant. Smithfield will be complying with this request, and intends to cooperate fully with OSHA. Moreover, the Missouri Department of Health and Senior Services ("MDHSS")—at Smithfield's invitation—intends to inspect the Plant in person on Monday, May 4, 2020, together with a representative from the local public health agency and the Missouri Department of Agriculture. The purpose of the visit is to conduct a site assessment

1

to review the Plant's compliance with OSHA and CDC guidance. The Court should defer to these agencies and their expertise in the subject matter. It need not—and should not—interject itself in this matter.

In any event, Plaintiffs have utterly failed to establish that they are entitled to injunctive relief. Most notably, there is no imminent threat of irreparable harm. Smithfield has taken *substantial* steps to protect both its employees and the public at large, and not a single person at the Plant has been diagnosed with COVID-19. Nor are there positive cases in Sullivan County. Potential harm is not enough. Plaintiffs must show a threat of irreparable harm now—in the present, given the steps that Smithfield has taken. This they cannot do, and for these reasons, their Motion should be denied.

## II.    FACTS

### A.    Smithfield and the Plant

The named defendants in this action are Smithfield Foods, Inc. and its wholly owned subsidiary, Smithfield Fresh Meats Corp. (collectively, "Smithfield"). Smithfield Fresh Meats Corp. owns and operates the Plant at issue, which is located in Milan, Missouri and is an integral member of the community there. *See* **Exhibit A,** Declaration of Timmy D. Messman ¶¶ 2, 7 ("Messman Decl.").

The Plant is a meat processing facility. *Id.* ¶ 8. As such, it is an essential business that has lawfully continued to operate in accordance with the Governor of Missouri's stay-at-home order.[1] The Plant and its operations constitute "critical infrastructure" pursuant to the order, which adopted

---

[1] Mo. Exec. Order (April 3, 2020), https://governor.mo.gov/priorities/stay-home-order.

the guidelines issued by the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency.[2] *See* Messman Decl. ¶ 8.

Pursuant to Smithfield's priority of protecting the health and safety of its employees and consumers at all times, the Plant—led by management and a twelve-person dedicated safety team[3]—has implemented substantial workplace safety measures in response to COVID-19. *Id.* ¶ 4-5, 9-11. These procedures, described in detail below, are consistent with those communicated by the CDC, OSHA, and state/local public health officials. *Id.* ¶ 9. These actions complement safety measures already in place at the Plant and are in addition to the hygienic and sanitary environments maintained at all times for food safety and quality purposes, as verified by the USDA inspectors that are consistently present at the Plant. *Id.* ¶ 10.

As of the date of this filing, there have been no confirmed diagnoses of COVID-19 at the Plant. *See* Messman Decl. ¶ 18. Moreover, MDHSS is reporting zero cases of COVID-19 in Sullivan County, which surrounds the city of Milan.[4] A majority of counties adjacent to Sullivan County also have zero positive cases to date, and the case counts are relatively low in the few adjacent counties that have reported positive cases.[5]

---

[2] *See id.* Item 2 (incorporating CISA's definition of "critical infrastructure"); U.S. CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, ADVISORY MEMORANDUM ON IDENTIFICATION OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS DURING COVID-19 RESPONSE (April 17, 2020), https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_1.pdf, p. 8 (defining "critical infrastructure" employees to include "food manufacturer employees," such as those working in "livestock [and] poultry … slaughter facilities").

[The order references Version 2.0 of the guidance, which appears to be no longer publicly available, as it was removed from the CISA website after Version 3.0 was published. A description of the update on CISA's website indicates the definitions regarding food processing plants remain unchanged. *See* https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce.]

[3] The Milan Plant has received various awards related to its occupational health and safety programs, both within Smithfield and by outside organizations such as the North American Meat Institute ("NAMI"). *See* Messman Decl. ¶ 8.

[4] *See* MISSOURI DEPT. OF HEALTH & SENIOR SERVICES, COVID-19 OUTBREAK GUIDE, https://health.mo.gov/living/healthcondiseases/communicable/novel-coronavirus/results.php (last accessed April 28, 2020).

[5] Compare the number of positive cases in neighboring counties (Adair - 12, Livingston - 2, Linn - 5, and Macon - 2) with other significant outbreak locations in the state (St. Louis County - 2,958, Kansas City - 508, Greene County - 82). *Id.*

3

## B. Plaintiffs' Complaint

Plaintiffs Rural Community Workers' Alliance ("RCWA") and Jane Doe (collectively, "Plaintiffs") allege that RCWA is "a membership organization whose members consist exclusively of workers in Northeast Missouri, including numerous members who work at the Plant." Compl. at ¶ 30. The Complaint asserts that members of RCWA's "leadership council" work at the Plant, and that it has a "Health Action Council" that "sets the direction and activities of the organization." *Id.* at ¶ 31. It is unclear whether the "leadership council" is the same as the "Health Action Council," and to what extent any Plant employee serves on either. Neither the Complaint nor the Declaration filed by its Executive Director (ECF No. 3-3) provide any additional detail regarding the organization's membership structure, voting rights, or funding other than a statement that the organization "has an extremely limited operating budget." Fuentes Decl. at ¶ 6. The other Plaintiff, Jane Doe, is pursuing her claims under a pseudonym.

The Complaint asserts claims against Smithfield for abatement of an alleged public nuisance (Count I) and for an alleged breach of Missouri's common law duty to provide a safe place to work (Count II). *Id.* Both claims arise from Plaintiffs' concerns regarding Smithfield's workplace safety practices and procedures as they relate to potential COVID-19 exposure.

To be clear, this is not a suit for personal injury or wrongful death. Although Plaintiffs assert that the Plant's response to COVID-19 has been inadequate, they do not allege that any of RCWA's members, Jane Doe, or anyone else has contracted COVID-19 at the Plant. Indeed, Plaintiffs stipulate that they are not seeking money damages. Compl. at ¶ 16.

Plaintiffs instead seek only declaratory and injunctive relief. Compl. at ¶ 123. Plaintiffs seek a Court Order, in the form of an injunction, requiring Smithfield to implement a series of work practices, some specific (e.g., "provide clean masks") and some vague and ill-defined (e.g., "ensure social distancing throughout the Plant"). *See* Plaintiffs' Supporting Suggestions Brief at

2 (ECF No. 3).  Plaintiffs describe their request for injunctive relief as an order for Smithfield to "come into compliance with the Center for Disease Control's recommendations." *Id.*  However, Plaintiffs advise that "additional relief will be required to fully protect Plant workers and the larger community, and therefore, Plaintiffs also request that this Court set a date for Plaintiffs' experts to inspect the Plant to determine additional steps that should be taken." *Id.* at 3.  Presumably, Plaintiffs would return to this Court to seek a further injunction requiring those "additional steps."

## C.  Smithfield's COVID-19 Safety Procedures

Plaintiffs' Complaint and the Declarations supporting their Motion grossly misstate the safety procedures that Smithfield has implemented at the Plant in response to COVID-19.[6] Smithfield has separately filed a Motion to Strike the Declarations because, among other things, the declarants lack personal knowledge and their statements are based on speculation and hearsay.

As set forth below, the reality is that the Plant has already instituted the practices that Plaintiffs demand (to the extent they are legally permissible)—and more.

- *Plaintiffs' Demand No. 1:  Provide clean masks to all workers, inspectors, or contractors who enter the Plant, and require that they be worn at all times except when eating.*

**Plaintiffs' allegations:**  Plaintiffs acknowledge that the Plant increasingly provided employees with masks over the past two weeks yet assert that workers "may" be asked to use the same mask throughout an entire week, and further, that Plaintiff Jane Doe has observed members of the Plant's sanitation crew not wearing masks.  Pl.'s Br. at 9-10 (citing Doe Decl. ¶¶ 5-6; Fuentes Decl. ¶¶ 11-12).

---

[6] Plaintiffs' Complaint and Declarations contain other baseless allegations regarding pre-COVID-19 conditions at the Plant and Plaintiff Jane Doe's alleged fear of retaliation.  Smithfield disputes those allegations, but in the interest of time and brevity, Smithfield has focused its response on the issues related to COVID-19, which is the subject matter of Plaintiffs' request for injunctive relief.

**Smithfield's response:** Every individual that enters the Plant—including the personnel of essential service providers—is required to wear facial personal protective equipment ("PPE"). *See* Messman Decl. ¶ 11(g). The Plant provides employees with an ear-looped face mask upon entry to the Plant each day. *Id.* Masks are required to be worn at all times, except when employees are eating and in certain office areas where employees are spaced more than six feet apart. *Id.* Additionally, employees on the production floor are required to wear nitrile gloves and a plastic face shield. *Id.* If an employee's face mask breaks or becomes soiled during the workday, the Plant provides a new mask. *Id.* ¶ 11(h).

It is Plant policy that all persons, including sanitation workers, wear masks at all times in the facility, except in the limited circumstances set forth above. The Plant has assigned a nurse and the health and safety clerk to perform checks in hallways, the cafeteria, and other areas throughout the Plant in an effort to ensure global compliance with this policy. *Id.* ¶ 11(o).

- ***Plaintiffs' Demand No. 2: Ensure social distancing throughout the Plant, including on the lines.***

**Plaintiffs' allegations:** Plaintiffs acknowledge that the Plant has installed Plexiglas dividers between employees working closely together but faults the Plant because, as a result of workers' varying heights, some dividers are allegedly not installed at the necessary height to cover certain employees' faces. Pl.'s Br. at 10 (citing Doe Decl. ¶¶ 7-8; Fuentes Decl. ¶¶ 13-16). Additionally, Plaintiffs acknowledge that the Plant has "expand[ed] the cafeteria," hung "signs recommending distancing," and "installed Plexiglas dividers down the center of the cafeteria tables." Pl.'s Br. at 11 (citing Doe Decl. ¶¶ 13-16; Fuentes Decl. ¶¶ 20-22). However, they assert that employee crowding still occurs during clocking in and out times, during thermal checks, and in the cafeteria. *Id.*

**Smithfield's response:**  Smithfield has implemented numerous procedures to facilitate social distancing at the Plant.  Before employees ever enter the facility, they undergo a thermal screening.  Messman Decl. ¶ 11(e).  To decrease crowding as employees approach and move through the thermal screening areas, visual markers are provided every six feet.  *Id.* ¶ 11(f).  Management personnel also monitors the thermal screening area to ensure social distancing.  *Id.*

Further, the Plant has staggered workday start times to facilitate social distancing upon entry and exit.  *Id.* ¶ 11(j).  The Plant has likewise staggered lunch and break times to facilitate social distancing in the Plant cafeteria and other common areas.  *Id.* ¶ 11(k).  The Plant has also reduced the number of hogs harvested each day, such that the employees on the Kill Floor are working only a half-day and are released before lunch.  *Id.* ¶ 11(l).  This effort further helps to minimize crowding in the cafeteria and other eating areas.  *Id.*  The Plant has assigned a nurse and health and safety clerk to monitor the cafeteria during lunch and remind employees to maintain the appropriate distance.  *Id.* ¶ 11(o).

In furtherance of the same purpose, the Plant has erected a 30 ft. x 30 ft. tent and three carport structures on the Plant lawn, and placed eating tables and chairs underneath each, for the purpose of expanding available common areas and facilitating social distancing during breaks.  *Id.* ¶ 11(n).  An additional 30 ft. x 20 ft. tent will be erected during the week of April 27, 2020.  *Id.*

Moreover, to the extent that social distancing is not physically possible within the Plant, Smithfield has taken extensive steps to create physical barriers between employees.  The Plant has installed plastic barriers along the Plant production line that separate both (1) employees working across from each other, and (2) employees working side by side.  *Id.* ¶ 11(i).  Plant Management is not aware of any employee complaints about the placement of these barriers and has not observed any issues with the placement.  *Id.* ¶ 24.  Any issue with barrier placement would

7

promptly be remedied. *Id.* Through these efforts, every employee at the Plant performs their assigned job duties with either six feet of separation from their nearest co-worker(s) or a plastic barrier separating them from their nearest co-worker(s). *Id.* ¶ 11(i).

The Plant has also installed plastic barriers on all eating tables that separate employees from those sitting beside them and those sitting across from them. *Id.* ¶ 11(m), (n). Tables are sanitized after one employee leaves and before another one sits down. *Id.* ¶ 11(m).

Finally, to facilitate social distancing further, the Plant is currently working to secure a wireless means for employees to clock in and out at the beginning and end of the workday to minimize crowding during those times. *Id.* ¶ 12. In the meantime, the Plant has expanded the available time clocks that can be used for employees punching in and out for the workday to minimize hallway congestion. *Id.* ¶ 11(p). The Plant has also encouraged employees to avoid carpooling to and from work to the extent possible. *Id.* ¶ 11(x).

- ***Plaintiffs' Demand No. 3: Ensure that all workers at the Plant have the opportunity to wash their hands as needed without penalty.***

**Plaintiffs' allegations:** Plaintiffs' Brief asserts that Smithfield "does not offer breaks for handwashing." Pl.'s Br. at 11. This is a patently untrue statement that finds no support in Plaintiffs' declarations. *See* Doe Decl. ¶¶ 9-11; Fuentes Decl. ¶¶ 18-19. Instead, Plaintiff Jane Doe and Declarant Axel Fuentes claim that the two 15 minute breaks and one 30 minute break that the Plant provides over the course of a workday are insufficient for proper handwashing and that Smithfield has not provided additional opportunities for handwashing during COVID-19. *Id.* That said, Plaintiffs acknowledge that the Plant administers sanitizer while employees are working on the line. *Id.*

**Smithfield's response:** Due to the nature of Smithfield's meat processing business, employees in food production areas are required to wear, independent of COVID-19, nitrile gloves

to prevent the spread of germs. Messman Decl. ¶ 11(q). Standard operating procedures for the facility require that any time an employee leaves the production line for a break, they must remove their gloves and sanitize their hands before entering the common areas. *Id.* ¶ 21. Before employees return to the production line, they are required to sanitize their hands again, and put on a new pair of gloves. *Id.* During COVID-19, the Plant is administering hand sanitizer to production line employees every 30 minutes. *Id.* Additionally, while on breaks, employees have access to locker room and restroom sinks for further hand washing.[7] *Id.*

As a meat processing facility, with USDA inspectors consistently present, the Plant has an obligation—independent of COVID-19—to ensure that employee handwashing and sanitizing is performed properly in order to prevent issues of food safety or quality. *Id.* The Plant's standard operating procedures for handwashing and sanitizing are audited every year as part of the Safe Quality Food ("SQF") program. *Id.* If the allowed time for breaks was not sufficient to achieve this purpose, the Plant would not maintain its SQF certification or be allowed to continue operating. *Id.* The Plant has reiterated and emphasized the importance of these steps in its COVID-19 communications. *Id.* ¶ 11(q).

The Plant has further added approximately 110 hand sanitizing stations throughout the facility, including at all Plant entrances and exits, at the cafeteria entrance and exit, at locker room entrances and exits, and throughout hallways. *Id.* ¶ 11(r). The Plant has also invited employees to bring personal hand sanitizer bottles into the Plant to be refilled, without charge, using the Company supply. *Id.* ¶ 11(s). Finally, the Plant expects to receive a shipment of small hand sanitizer bottles in the near future that will be made available to each individual employee for personal use. *Id.* ¶ 14.

---

[7] To the extent employees request bathroom breaks between the Plant's regularly scheduled breaks, the Plant accommodates those requests as much as possible. *See* Messman Decl. at ¶ 21.

- *Plaintiffs' Demand No. 4: Provide tissues.*

**Plaintiffs' allegations:** Plaintiffs emphasize the lack of tissues at the Plant and how the allegedly increased speed of the production line during COVID-19 makes it impossible to cover a sneeze or cough or clean one's face—and in any event, Plaintiffs say, employees would be punished for doing so. Pl.'s Br. at 10-11 (citing Doe Decl. ¶ 12; Fuentes Decl. ¶¶ 17-18).

**Smithfield's response:** As a preliminary point, the Plant has not increased the speed of its production line during the COVID-19 pandemic. Messman Decl. ¶ 23. Plaintiffs' assertion otherwise is simply not correct.

Further, the Plant does not and cannot make tissues, or similar foreign materials, available in the production area of the facility. *Id.* ¶ 23. This practice would be an obvious violation of USDA standards for the meat processing industry. *Id.* However, all employees on the line wear masks and fluid-resistant face shields, thus preventing the spread of germs from a sneeze or cough. *Id.* Further, the line speed does not prevent an employee from taking a moment to sneeze or cough, and the Plant does not punish employees for doing so. *Id.*

- *Plaintiffs' Demand No. 5: Ensure high-touch surfaces are disinfected with a suitable cleaning agent throughout the day.*

**Plaintiffs' allegations:** Plaintiffs have presented no evidence that disinfection of high-touch surfaces is not already occurring at the Plant—nor can they.

**Smithfield's response:** The Plant production facility undergoes regular cleaning and sanitation by the Plant's in-house sanitation crew pursuant to industry standards for food safety and quality purposes. Messman Decl. ¶ 11(t). In response to COVID-19, the Plant has enhanced cleaning and disinfection protocols of frequently touched surfaces in welfare and common areas using cleaning solutions identified by the CDC for this purpose. *Id.* ¶ 11(u). This cleaning is performed throughout the workday—in some areas, as frequently as every two hours—by

10

personnel specifically assigned to carry out this task. *Id.* The Plant has also implemented additional deep cleanings over the weekends and is working to implement use of fogging/misting disinfectants in the facility where possible. *Id.* ¶¶ 11(u), 13.

- *Plaintiffs' Demand No. 6: Change all relevant policies to meaningfully encourage workers who are diagnosed with, have symptoms of, or who believe they have been exposed to COVID-19 to take sick leave.*

**Plaintiffs' allegations:** Plaintiffs claim that the Plant "continues to discourage workers from taking sick-leave" during COVID-19 and will penalize them and withhold Smithfield's "Responsibility Bonus" if they do so. Pl.'s Br. at 9, 11-13 (citing Doe Decl. ¶ 17-19; Fuentes Decl. ¶¶ 23-25).

**Smithfield's response:** As a preliminary matter, the Plant clearly, consistently, and frequently instructs its employees to self-monitor for symptoms of COVID-19, including fever, cough, and shortness of breath. Messman Decl. ¶ 11(a). The Plant further clearly, consistently, and frequently instructs its employees to stay at home if (1) they are experiencing symptoms of COVID-19, such as fever, cough, and shortness of breath, (2) they have exposure to someone who has been diagnosed with COVID-19, or (3) they have visited an area with widespread community spread of COVID-19. *Id.* ¶ 11(b). These instructions are communicated on televisions throughout the Plant, on signage throughout the Plant, through the Beekeeper employee communications app, and through the Textcaster mass text messaging tool. *Id.* ¶ 11(d). COVID-19 related signage in the Plant is provided in English, Spanish, and French. *Id.* Communications through Beekeeper and Textcaster are available in the language of each individual employee's choice. *Id.* Interpreters are also available at the Plant to assist in COVID-19 communications. *Id.*

No employee is penalized in any way for missing work as a result of a COVID-19-related quarantine. *Id.* ¶ 15. No employee receives attendance points for missing work as a result of a COVID-19 related quarantine. *Id.* Employees staying home for this purpose receive paid leave

and remain eligible for Smithfield's Responsibility Bonus, regardless of whether they provide a doctor's or nurse's note. *Id.* The Plant clearly, consistently, and frequently communicates this information to employees. *Id.* Further, to the extent employees disclose to the Plant certain underlying health conditions that their physician believes places them at higher risk for COVID-19 and provide documentation of the same, those employees are given 14 days of paid leave, and following the conclusion of that time period, are shifted to short term disability leave. *Id.* ¶ 16.

- ***Plaintiffs' Demand No. 7: Ensure that measures are in place for workers to obtain testing when necessary.***

   **Plaintiffs' allegations:** Plaintiffs next assert that the Plant has not offered employees an opportunity to be tested for COVID-19 or aided them in obtaining such testing. Pl.'s Br. at 13 (citing Fuentes Decl. ¶ 25).

   **Smithfield's response:** Plaintiffs are correct that the Plant does not provide COVID-19 testing on site. However, employee benefits have been expanded to eliminate co-pays for COVID-19 related testing and treatment. Messman Decl. ¶ 15. In addition, the Plant performs thermal screenings to detect whether employees have elevated temperatures. *Id.* ¶ 11(e). To the extent an employee does, the Plant (1) provides the employee with instructions for next steps, including directions to quarantine and to call their physician for guidance on the appropriate location for COVID-19 testing and procedure, and (2) sends the employee home for 14 days of ***paid*** leave or until the individual receives a negative COVID-19 test result. *Id.*

- ***Plaintiffs' Demand No. 8: Develop and implement a plan for contact tracing, in coordination with public health officials.***

   **Plaintiffs' allegations:** Plaintiffs finally assert that the Plant has not performed "contact tracing" to identify which workers have come into contact with a sick individual and thus should be ordered to quarantine. Pl.'s Br. at 13 (citing Doe Decl. ¶ 22; Fuentes Decl. ¶ 25).

12

**Smithfield's response:** The Plant requires any employee undergoing a quarantine as a result of COVID-19-related symptoms to complete a Questionnaire that, among other topics, requests the names of all employees with whom the subject employee has had close contact in the two days prior to the start of symptoms. Messman Decl. ¶ 17. If the employee tests positive for COVID-19, the close-contact employees would be notified and screened for possible quarantine. *Id.* To date, the Plant is not aware of any employees who have tested positive for COVID-19. *Id.* ¶ 15.

Overall, the management team at the Plant has proactively undertaken extensive and ongoing efforts to ensure compliance with all CDC and OSHA COVID-19 response guidelines and to develop thoughtful and creative solutions to protect employees in ways that are tailored to the facility and the realities of meat processing operations. Messman Decl.¶ 25; *see also* Declaration of John Henshaw, former Director of OSHA ("Henshaw Decl."), attached as **Exhibit B** (expressing an opinion that Smithfield's policies and procedures are consistent with OSHA and CDC guidance). Plaintiffs' unsupported assertions to the contrary are simply untrue.

**D.     The OSHA Request for Information**

On April 22, 2020, the day before Plaintiffs filed their Complaint, Smithfield received a "Rapid Response Investigation" request from OSHA seeking comprehensive information regarding COVID-19 safety practices and infection at the Plant. *See* **Exhibit C**. Smithfield will be complying with the request, and intends to cooperate fully with OSHA.[8] .

---

[8] Smithfield's Letter to the Court dated April 25, 2020 mistakenly stated that the OSHA request for information was received on April 23 and required a response on April 28. At the time the Letter was filed, Smithfield was in the midst of gathering information responsive to both this lawsuit and the OSHA request. Smithfield now corrects that mistake.

13

## E.    OSHA's Role

The Occupational Safety and Health Act, 29 U.S.C. §§ 651, *et. seq.* (the "Act"), was enacted "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b).  The Act authorizes "the Secretary of Labor to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." *Id.* at § 651(b)(3).

OSHA is the federal agency charged with administering the Act.  OSHA provides a procedure for an employee who is concerned about workplace safety to file a confidential complaint requesting that OSHA initiate an investigation into the employer's work practices.[9]

The Act specifically includes procedures to address an imminent danger.  *Id.* at § 662.  The Act permits the Secretary of Labor to petition the court to restrain employment practices if they present a danger that "could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated." *Id.*  The Act authorizes an employee to file a writ of mandamus to compel the Secretary to seek such an order if the employee believes that the Secretary "arbitrarily or capriciously fails to seek relief." *Id.*  Critically, when an employee files a writ of mandamus, OSHA is directly involved, and the court is not making decisions without insight from the agency tasked with ensuring workplace safety.

Unsurprisingly, OSHA has already developed workplace safety protocols in response to COVID-19.  The CDC and OSHA jointly issued Interim Guidance *specific* to the meat processing industry.  *See* **Exhibit D**.  OSHA has also published the more general "Guidance on Preparing Workplaces for COVID-19," which makes clear that the agency will enforce any unsafe conditions

---

[9] *See* https://www.osha.gov/workers/file_complaint.html

relating to COVID-19. **Exhibit E** at 4. OSHA has also issued Interim Enforcement Guidance for Coronavirus Disease 2019 (issued April 13, 2020), which identifies several applicable standards that may apply to COVID-19. *See* **Exhibit F**.

**F.      State and Local Public Health Authorities**

While OSHA is responsible for workplace safety, Missouri state and local government is responsible for the public safety. Missouri, like other states around the country, has implemented statewide policies to address the threat of COVID-19 exposure and transmission.

Governor Parson, through the Missouri Department of Health and Senior Services ("MDHSS"), issued a "stay-at-home" order on April 3, 2020.[10] The order includes general COVID-19 safety requirements and guidelines pertaining to individuals, as well as the operations of both essential and non-essential businesses.[11] In accordance with Mo. Rev. Stat. Ann. § 192.290, the Governor assigned responsibility for implementing and enforcing specific COVID-19 safety measures to "all local and state health authorities."[12]

MDHSS is fulfilling this responsibility, and has issued dozens of guidance statements containing COVID-19 safety measures,[13] including several statements pertaining specifically to workplace safety.[14] Additionally, MDHSS and local health agencies have worked closely with a number of private businesses to monitor and develop their COVID-19 safety measures.[15] MDHSS

---

[10] Mo. Exec. Order (April 3, 2020), https://governor.mo.gov/priorities/stay-home-order.

[11] *See id.*, Items 1-3.

[12] *See id.*, p. 2.

[13] *See* MDHSS, HEALTH ALERTS, ADVISORIES & UPDATES, https://health.mo.gov/emergencies/ert/alertsadvisories/index.php (last accessed April 26, 2020)

[14] *See, e.g.,* MDHSS, INTERIM GUIDANCE FOR IMPLEMENTING SAFETY PRACTICES FOR CRITICAL INFRASTRUCTURE WORKERS, https://health.mo.gov/emergencies/ert/alertsadvisories/pdf/update4920.pdf (last accessed April 26, 2020); MDHSS, COVID-19 AND RETURN TO WORK MESSAGING - EXPANDED GUIDANCE FOR CRITICAL INFRASTRUCTURE PERSONNEL INVOLVED IN THE PROVISION OF DIRECT CLIENT CARE, https://health.mo.gov/emergencies/ert/alertsadvisories/pdf/guidance41720.pdf (last accessed April 26, 2020).

[15] *See, e.g.,* JEFFERSON COUNTY HEALTH DEPARTMENT BLOG, "Jefferson County Health Department Reports COVID-19 Outbreak At Festus Manor Care Center," (April 17, 2020) http://www.jeffcohealth.org/blog/2020/4/17/jefferson-county-health-department-reports-covid-19-outbreak-at-festus-manor-care-center (noting that a nursing facility is "working closely with Jefferson County Health

has also worked closely with federal agencies in responding to the virus,[16] and the CDC has made itself available to assist state and local agencies in their response to COVID-19.[17]

Missouri law requires that Missouri's COVID-19 response be led by state and local agencies. All "public health functions and programs" in Missouri must be supervised and managed by the MDHSS. Mo. Rev. Stat. Ann. § 192.005. Further, Missouri specifically requires that the Director of MDHSS use "the legal means necessary to control" diseases and conditions that are a public health condition, including "[o]utbreaks (including nosocomial) or epidemics of any illness, disease, or condition that may be of public health concern." 19 Mo. C.S.R. 20-20.020, 20-20.040. That provision undoubtedly covers COVID-19.

Under MDHSS regulations, upon report of an infectious disease under Section 20-20.020, both the Director and "local health authorit[ies]" have a duty to take certain actions to control it:

(A) Inspect any premises that they have reasonable grounds to believe are in a condition conducive to the spread of the disease; . . .

(E) Establish and maintain quarantine, isolation or other measures as required;…

(G) Establish appropriate control measures which may include . . . closure of establishment, . . . the creation and enforcement of adequate orders to prevent the spread of the disease and other measures considered by the department and/or local health authority as appropriate disease control measures based upon the disease, the patient's circumstances, the type of facility available,

_____

Department to contain the virus"); "Coronavirus Latest," KMOV4 News, (April 8, 2020) https://www.kmov.com/coronavirus-covid-latest-info-in-st-louis/article_f35c5f16-7038-11ea-9c06-f30dcb4bc9eb.html (noting that a hospital "is continuous contact with St. Charles Health Department so that they can notify individuals who may have been exposed during this time and determine a proper course of action").

[16] *See, e.g.*, Office of the Governor Press Release, "Governor Parson Gives Updates On Missouri National Guard, Department of Economic Development Efforts to Assist with COVID-19 Response," https://governor.mo.gov/press-releases/archive/governor-parson-gives-updates-missouri-national-guard-department-economic (Mar. 31, 2020); Office of the Governor Press Release; MDHSS Press Release, "DHSS Director Williams meets at White House to discuss federal, state and local health officials' strategic alignment on COVID-19," https://health.mo.gov/news/newsitem/uuid/ffc9eb47-c189-4cc7-8a24-6130a710dbb3/dhss-director-williams-meets-at-white-house-to-discuss-federal-state-and-local-health-officials-strategic-alignment-on-covid-19 (Feb. 27, 2020).

[17] U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION, "CDC Support to Health Officials," https://www.cdc.gov/publichealthgateway/healthdepartmentresources/health-official-support.html (last accessed April 26, 2020) (noting states' 10th Amendment police powers to respond to health emergencies, and offering various means of assistance aimed to helping states to implement those powers).

16

and any other available information related to the patient and the disease or infection.

19 Mo. C.S.R. 20-20.040.

Plaintiffs have identified several meat processing plants around the country that have had COVID-19 outbreaks. Pl.'s Br. at 7-8. But those instances just prove the point: the public health agencies intervened to shut down or require those facilities to implement specific safety procedures. The courts have not been involved.

## G. Public Health Inspection of the Plant

At Smithfield's invitation, the MDHSS is scheduled to conduct a site assessment at the Plant on Monday, May 4, 2020, together with a representative from the local public health agency and the Missouri Department of Agriculture. The purpose of the visit is to review the Plant's compliance with OSHA and CDC guidance.

## III.   ARGUMENT

A preliminary injunction should issue only if four factors weigh toward granting the injunction: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981); *Calvin Klein Cosmetics Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir. 1987).

Moreover, a mandatory preliminary injunction requiring an affirmative act "should be granted only in rare instances where the facts and law are clearly in favor of the moving party, especially if the grant of the temporary injunction would in effect give the plaintiff the relief which he seeks in the main case." *Bricklayers, Masons, Marble & Tile Setters, Protective & Benevolent Union No. 7 of Neb. v. Lueder Constr. Co.*, 346 F. Supp. 558, 561 (D. Neb. 1972); *see also Hudson*

*v. School Dist. of Kansas City*, 578 S.W.2d 301, 312 (Mo. App. 1979) ("Relief by way of mandatory injunction is given with more caution than other types of injunctive relief."); *State ex. rel St. Charles County v. Samuelson*, 730 S.W.2d 607, 610 n.5 (Mo. App. 1987) ("Mandatory injunction is [a] harsh remedy to be granted by court only when right thereto is clearly established and should never be granted on doubtful proof."); *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 484 (8th Cir. 1993) (noting heavy burden when injunction "will give substantially the relief" plaintiff "would obtain after a trial on the merits").

Here, Plaintiffs fall woefully short of meeting their burden. Their standing to pursue the claims—as a "membership organization"[18] and an "anonymous employee"[19]—is questionable, and the evidence they offer is based in large part on speculation, hearsay, and outdated information. But even putting these issues aside, Plaintiffs' Motion fails on every one of the injunction requirements. Accordingly, Plaintiffs' Motion for Preliminary Injunction should be denied.

**A.  Plaintiffs Do Not Have A Likelihood of Success on the Merits.**

To demonstrate a "likelihood of success on the merits," a plaintiff must show "a fair chance of prevailing" in the suit. *Planned Parenthood of Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732

---

[18] Plaintiffs' sparse allegations do not meet RCWA's burden of proving associational standing. In order to assert "associational standing," the organization must have actual members, not constituents or interested parties. *See Missouri Protection & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 809-810 (8th Cir. 2007). "[M]ere assertion that an individual is a 'member' of an organization is not sufficient to establish membership." *AARP v. EEOC*, 226 F. Supp. 3d 7, 16 (D.D.C. 2016). Rather, the individuals must "possess all of the indicia of membership in [the] organization." *Group Health Plan, Inc. v. Philip Morris, Inc.*, 86 F. Supp. 2d 912, 918 (D. Minn. 2000). In order to meet this "indicia of membership" test, "the constituents of an organization must exercise a certain measure of control over the organization." *Id.*; *see also Wash. Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (noting that an indicia of membership includes "(i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities."). Plaintiffs have not made this showing.

[19] Neither Smithfield nor the Court has any basis to determine whether Jane Doe has standing as an employee. "[T]here is a strong presumption against allowing parties to use a pseudonym." *W.G.A. v. Priority Pharmacy, Inc.*, 184 F.R.D. 616, 617 (E.D. Mo. 1999); *T.S.H. v. Northwest Missouri University*, 2019 WL 5057586 (W.D. Mo. 2019). Typically, a plaintiff that desires to proceed anonymously under a pseudonym must first "request permission from the district court." *W.N.J. v. Yocumi*, 257 F.3d 1171, 1172 (10th Cir. 2001). Moreover, at least two Courts of Appeal have held that "[f]ailure to seek permission to proceed under a pseudonym is fatal to an anonymous plaintiff's case, because … 'the federal courts lack jurisdiction over the unnamed parties, as a case has not been commenced with respect to them.'" *Id.*; *Citizens for a Strong Ohio v. Marsh*, 123 Fed. Appx. 630, 637 (6th Cir. 2005).

18

(8th Cir. 2008). Such a "fair chance" is established where the claims raised are "sufficiently supported by the facts of the case and the governing law." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003). Here, Plaintiffs cannot demonstrate a likelihood of success on the merits, and their request for injunctive relief should be denied.

### 1. Plaintiffs are not likely to succeed on their public nuisance claim.

### a. The Plant is not a public nuisance.

Under Missouri law, "a public nuisance is an offense against the public order and economy of the state and violates the public's right to life, health, and the use of property, while, 'at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons.'" *State ex rel. Schmitt v. Henson*, ED 107970, 2020 WL 1862001, at \*4 (Mo. Ct. App. April 14, 2020) (citations omitted).

Here, Plaintiffs have not—and cannot—demonstrate that Smithfield's operation of the Plant constitutes a public nuisance. The Plant is an essential business under the Governor's stay-at-home order. Moreover, President Trump's newly issued Executive Order directs meat processing plants to continue to operate. Thus, to the extent Plaintiffs contend that the Plant is a public nuisance by virtue of its status as a meat processing Plant that is operating during the COVID-19 pandemic, they are plainly wrong.

Moreover, Smithfield has implemented substantial health and safety measures to protect Plant workers and the community from COVID-19, which are consistent with OSHA and CDC guidelines. *See* Messman Decl. ¶¶ 9-18; Henshaw Decl. ¶¶ 20-25. What is more, not a single employee of the Plant has been diagnosed with COVID-19, and there are no reported cases in Sullivan County. In short, there is a complete lack of evidence that the Plant is a public nuisance, and the Court need go no further.

**b.** **Plaintiffs have not suffered any special injury required to bring a claim for public nuisance.**

To assert a private cause of action for a public nuisance, Plaintiffs "must show specific and particularized harm from the public nuisance … different in kind from the harm to the rest of the community." *Benjamin Moore*, 226 S.W.3d 110, 116 (2007); *44 Plaza, Inc. v. Gray-Pac Land Co.*, 845 S.W.2d 576, 580 (Mo. App. E. Dist. 1992) (noting that the injury must "differ[] in kind, and not just degree, from the injury to the general public").

Plaintiffs have pleaded precisely the opposite. Rather than a particular harm, they seek to enjoin operations due to "community spread." Besides the fact that Smithfield did not cause the community spread, the special harm that Plaintiffs allege is no different than what they allege for the general public. (Compl. ¶ 113). Missouri law does not allow such a claim. "[T]he private tort [of public nuisance] accrues to recompense damage particular to the person and not shared with the general public." *State ex inf. Ashcroft v. Kansas City Firefighters Local No. 42*, 672 S.W.2d 99, 114–15 (Mo. App. 1984).

A community spread is not a special injury and cannot be alleged as one. For example, the plaintiff in *Benjamin Moore* could not show a "particularized harm from the public nuisance of lead paint" that differed from the general public. *Benjamin Moore*, 226 S.W.3d at 116. The same is true here. Plaintiffs' complaint of nuisance and the harm potentially caused by COVID-19 is no different than that allegedly suffered by the public.

RCWA tries to salvage its claim by saying that it has diverted resources to address its members' concerns about COVID-19, but that argument fares no better. These alleged damages are necessarily premised on the same injury or threat of injury faced by the general public—fear of COVID-19 exposure. Plaintiffs have failed to allege a specialized injury, and therefore, they have failed to demonstrate a likelihood of success on the merits of their public nuisance claim.

**2.      Plaintiffs are not likely to succeed on their claim for breach of the duty to provide a safe place to work.**

Plaintiffs' claim for breach of the duty to provide a safe workplace is also not likely to succeed.  Under Missouri law, Plaintiffs are required to prove that Smithfield negligently breached the duty to provide a safe place to work, and that such negligence was the direct and proximate cause of the plaintiff's injuries.  *Hamilton v. Palm*, 621 F.3d 816, 818 (8th Cir. 2010).  Here, Plaintiffs can do neither, and their claim is preempted in any event.

**a.      Plaintiffs have no evidence of a breach or an injury.**

First, Plaintiffs have failed to demonstrate any ongoing breach of duty that warrants injunctive or declaratory relief.  Smithfield has demonstrated, through a sworn declaration made on personal knowledge, that it has taken substantial steps to reduce the potential for COVID-19 exposure and transmission at the Plant.  In contrast, Plaintiffs offer only speculation, hearsay, and anonymous declarations.  *See Alaska State Employees Ass'n, Local 52 v. State of Alaska*, Case No. 3AN-20-05652CI at 18 (Alaska Sup. Ct. April 27, 2020) (denying injunctive relief because, among other reasons, the evidence did not show that the State is "probably" violating the duty to provide a safe place to work).

Furthermore, under Missouri law, part of an employer's duty to provide a safe workplace is complying with federal regulations.  *Parr v. Breeden*, 489 S.W.3d 774, 780-81 (Mo. 2016).  As detailed above, the Plant has implemented substantial workplace safety measures in response to COVID-19 that are consistent with the recommendations of the CDC, OSHA, and state and local public health officials.  Messman Decl. ¶ 9.  Because Plaintiffs have no evidence to the contrary, their claim fails.

Second, Plaintiffs have not proved that they have suffered any injury. Their entire claim is premised only on a *potential* for injury. Thus, they cannot state a claim for breach of the employer's duty to provide a safe place to work.

    **b.**    **Plaintiff's reliance on *Smith v. Western Elec. Co.* is misplaced.**

Plaintiffs cite *Smith v. Western Elec. Co.*, 643 S.W.2d 10 (Mo. App. E. District 1983), for the proposition that injunctive relief may be granted in connection with a claim for breach of the duty to provide a safe place to work. Pl. Brief at16. However, that case is easily distinguished.

First, and most simply, the plaintiff in *Smith* had already suffered an injury from smoke in the workplace, and his continued exposure threatened to worsen his condition. Plaintiffs here have not shown any injury.

Second, the plaintiff had exhausted other avenues of relief "both through his employer's in-house channels and through administrative agencies." *Id.* at 13. Plaintiffs here meet neither of these requirements. They have not exhausted other forms of relief, including proceeding with OSHA's complaint process or seeking assistance from state and local public health agencies.

Third, *Smith* does not support the relief Plaintiffs are seeking. The court in *Smith* did not grant an injunction. It merely held that the lower court erred in dismissing the complaint, and that injunctive relief may be proper if he ultimately prevailed on his claims.

And finally, the injunction sought in *Smith* is markedly different than the one at issue here. There, the plaintiff sought an injunction to prohibit the employer from exposing him to smoke. In contrast, Plaintiffs sek a mandatory injunction that would effectively result in the Court taking control of Smithfield's occupational health and safety program at the Plant.

### c. Plaintiffs' claim for breach of the duty to provide a safe place to work is preempted.

Plaintiffs also are not likely to succeed on their claim for breach of the duty to provide a safe place to work because the claim is preempted in whole or in part by the OSH Act.

The Act preempts state law relating to any occupational safety or health issue with respect to which a federal standard has been promulgated. *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 102 (1992). The Act contains a savings clause for workers' compensation or other "common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of employment." 29 U.S.C. § 653(b).

Here, Plaintiffs' request for injunctive relief includes several safety measures that are the subject of OSHA standards, including the provision of personal protective equipment (29 CFR 1910.132), sanitation (29 CFR 1910.141), first aid (29 CFR 1910.11), and implementation of workplace controls (e.g., social distancing) (29 CFR 1910.1030). Thus, preemption applies. The savings clause is inapplicable because Plaintiffs have not asserted a claim for any actual injury, disease, or death.[20]

For the foregoing reasons, Plaintiffs are not likely to succeed on the merits of either their public nuisance claim or their claim for breach of the duty to provide a safe place to work. Their request for injunctive relief should be denied. *See CDI Energy Servs. v. West River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2008) (affirming denial of preliminary injunction).

---

[20] *Smith v. Western Electric* does not hold otherwise. There, preemption did not apply because there was no OSHA standard governing tobacco smoke. 643 S.W.2d at 14. This case implicates several OSHA regulations.

**B.** **Plaintiffs have not demonstrated a threat of irreparable harm.**

"To succeed in demonstrating a threat of irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Disc.*, 696 F.3d 771, 778 (8th Cir. 2012). Merely demonstrating "the possibility of harm" is not enough. *Chlorine Inst., Inc. v. Soo Line R.R.*, 729 F.3d 903, 915-16 (8th Cir. 2015); *see also Lee's Summit*, 696 F.3d at 779 ("Speculative harm does not support a preliminary injunction.").

Failure to show that irreparable harm will occur is a sufficient basis to deny preliminary relief. *Id.* Moreover, "[i]t is well established that 'irreparable harm occurs when a party has no adequate remedy at law'" *Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)).

For a number of reasons, Plaintiffs have not demonstrated—and cannot demonstrate—a threat of irreparable injury sufficient to warrant a preliminary injunction.

**1.** **Plaintiffs have shown no actual harm or threat of harm.**

Plaintiffs argue that the virus has spread worldwide, infecting "hundreds of slaughterhouse workers around the country." Pl.'s Br. at 17. But this establishes, at most, the mere "possibility of harm."

As of the time of filing this brief, there are no confirmed cases of COVID-19 at the Milan Plant, or even elsewhere in Sullivan County, where the Plant is located. The possibility that a worker may get sick at some point in the future simply does not constitute an imminent threat of irreparable harm on which an injunction may be granted. *E.g.*, *Chlorine Inst.,* 792 F.3d at 915-16 (assertion that harm "will inevitably result sooner rather than later" was too speculative to justify injunction); *see also Dawson v. Asher*, 2020 WL 1704324, at *12 (W.D. Wash. Apr. 8, 2020)

(denying motion for TRO to require release of immigration detainees where no individual at the detention center had tested positive for COVID-19 because "[i]t would be improper for th[e] court to rely on conditions at other detention facilities").

Other courts agree that potential exposure to COVID-19 is not a present or imminent harm. The "core question" is whether plaintiffs "will suffer irreparable harm if the injunction is denied," not whether they "are exposed to risk from COVID-19 if they come to work." *Alaska State Employees Ass'n, Local 52 v. State of Alaska*, Case No. 3AN-20-05652CI.  The court there found it persuasive that the defendant was "already implementing the steps [plaintiff] seeks and will continue to do so even if injunctive relief is denied." *Id.* at 13; *see also Valentine v. Collier*, __ F.3d __, 2020 WL 1934431, *5 (5th Cir. Apr. 22, 2020) ("question is whether Plaintiffs have shown that they will suffer irreparable injuries *even after* accounting for the protective measures" that defendant had already implemented).  So too here.

**2.      Plaintiffs rely on past conduct—rather than current conditions.**

Plaintiffs' arguments that the Plant has previously been subject to safety concerns, and that Smithfield has been slow to implement safety measures, are irrelevant to the relief sought by a preliminary injunction.  "[P]resent harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action" *Noodles Dev., LP v. Ninth Street Partners, LLP*, 507 F. Supp. 2d 1030, 1039 (E.D. Mo. 2007).

As the Eighth Circuit has recognized, the necessity for injunctive relief "may be obviated by defendant's own action" prior to trial.  *Arkansas Ed. Ass'n v. Bd. of Ed. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 768 (8th Cir. 1971) (mandatory injunction against school district requiring it to cease salary discrimination was no longer necessary when defendant adopted an adequate salary schedule after the filing of the complaint); *see also Dawson*, 2020 WL 1704324, at *12 ("[G]iven

the measures Respondents are currently taking, the court cannot conclude either that the spread of COVID-19 inside [the detention facility] is inevitable, or that Respondent will be able to contain it if it occurs.").

Here, Smithfield enacted relevant safety measures even *before* Plaintiffs' Complaint was ever filed. Clearly, there is no present or imminent harm at issue sufficient to justify the requested injunctive relief.

### 3. Plaintiffs have an adequate remedy at law.

Plaintiffs also cannot show that an injunction is necessary because they have other avenues of relief. Specifically, they can seek relief through the OSHA complaint process or by engaging state and local public health agencies who are in a far better position to assess the Plant's safety practices and any threat to employee or public health. OSHA has the ability to seek emergency relief (if necessary) and the state and local public health authorities can—and do—shut down plants when necessary to protect the public health. Plaintiffs themselves cite at least one example of a public health authority shutting down a meat processing plant due to COVID-19 concerns. (Pl.'s Br. at 8).[21]

Here, the availability of effective legal relief through other means negates the need for injunctive relief. *See Grasso Enterprises, LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (pharmacies were not entitled to preliminary injunction compelling payment of claims where they had "an adequate remedy at law" because an ERISA suit would overturn the initial denial); *American Ass'n of Orthodontists v. Yellow Book USA, Inc.*, 277 S.W.2d 686, 695 (Mo. Ct. App. E.D. 2008) (same where plaintiff had the legal right and ability to file administrative complaint with dental board). Indeed, both OSHA and MDHSS are already involved at the Plant.

---

[21] Pursuant to the President's Executive Order, OSHA and state public health agencies presumably will coordinate with the Secretary of Agriculture on these issues.

In short, Plaintiffs have failed to demonstrate that they are at risk of any irreparable harm in the absence of a preliminary injunction, and their motion should be denied.

**C.      The Balance of Harms Does Not Support Injunctive Relief.**

Denial is also warranted where the balance of harms tilts towards the defendant. *See Noodles Dev.*, 507 F. Supp. 2d at 1038. This analysis "examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Id*. (citing *Dataphase*, 640 F.2d at 114). A court may consider practical impacts of the injunction, including the threat to each of the parties' rights that would result, potential economic harm, and whether the defendant has voluntarily taken remedial action. *Id*. at 1039 (citing *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994)).

Simply put, where a non-movant has voluntarily taken proactive steps to eliminate the potential of harm to the movant, "the balance of harms is readjusted" *Noodles Dev.*, 507 F. Supp.2d at 1039 (citing *Sanborn Mfg. Co.*, 997 F.2d 484, 489 (8th Cir. 1993)). Critically, an "illusory harm" to the movant will not outweigh actual harm to the non-movant. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992) (the loss of an "opportunity" that might result for the movant did not outweigh the deprivation of contractual rights that the non-movant would experience if subjected to the requested injunction).

Here, as outlined above, Smithfield's existing COVID-19 policies and procedures comply with OSHA and CDC recommendations, and meet each of Plaintiffs' demands. *See supra* at II.C. All Plaintiffs have shown is the potential of harm.

Meanwhile, this injunction would cause Smithfield real harm. A Court Order would impose undue burden on Smithfield by preventing it from adjusting its work practices to respond to changing circumstances and to protect its workers and the nation's food supply. *See Alaska State Employees Ass'n, Local 52 v. State of Alaska*, Case No. 3AN-20-05652CI at 14 (discussing

the need for flexibility "in the face of a rapidly changing crisis"); *see Valentine*, 2020 WL 1934431 at *5 (staying injunction that would "interfer[e] with the rapidly changing and flexible system-wide approach that [defendant] has used to respond to the pandemic so far" and "[defendant's] ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches") (citing *Jacobson v. Mass.*, 197 U.S. 11, 28-29 (1905); *In re Abbott*, 954 F.3d 772, 791 (5th Cir. 2020)).

These concerns are further exacerbated by Plaintiffs' request that their experts be permitted to inspect the Plant at some future date "to determine additional steps that should be taken." (Pl.'s Br. at 3). These additional, yet to be determined, recommendations could impede Smithfield's operations—negatively impacting not just Smithfield's business, but the food supply chain as a whole. Other plaintiffs may be emboldened to bring claims against Smithfield and other essential businesses around the country, regardless of whether they have actually contracted—or even been exposed to—COVID-19. Because the balance of hardships tips so strongly toward Smithfield, Plaintiffs' motion for a preliminary injunction should be denied.

**D.     Strong Public Policy Reasons Exist To Deny the Requested Injunction.**

The public interests implicated by Plaintiffs' requested relief also strongly disfavor issuance of an injunction. The Plant is an essential food manufacturing business pursuant to the Governor's stay-at-home order, the recent Executive Order issued by President Trump There is an obvious public interest in permitting such essential businesses to continue operating during this pandemic.[22] *See Lexington Healthcare Center of Bloomingdale, Inc. v. Morrison Management Specialists, Inc.*, 2020 WL 1820522 (N.D. Ill. Apr. 10, 2020) (compelling a nursing home dining

---

[22] The guidance provided by DHS on essential workers expressly states that allowing essential workers to continue working "is crucial to community resilience and continuity of essential functions." *See* https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce.

services provider to continue providing services despite non-payment of invoices on the basis that "[d]uring a pandemic, the[] interest in receiving these services is absolutely critical"). Further, the cascading economic impact that any business disruption to Smithfield will have on other individuals and companies should not be ignored—there is a recognized public interest in a reliable supply chain. *E.g.*, *Zoll Circulation, Inc. v. Elan Medizintechnik, GMBH*, 2010 WL 2991390, at *5 (C.D. Cal. July 26, 2010); *Pomeroy, Inc. v. Border Opportunity Saver Systems, Inc.*, 2010 WL 11652127, at *4 (W.D. Tex. Feb. 23, 2010).

Additionally, this Court has specifically recognized the importance of deferring to regulatory agencies "to promote uniformity and consistency within the particular field of regulation." *Sprint Spectrum L.P. v. AT&T Corp.*, 168 F.Supp.2d 1095, 1098 (W.D. Mo. 2001) (citations omitted); *see, e.g.*, *U.S. v. N.Y. City Housing Auth.*, 347 F. Supp. 3d 182, 208 (S.D.N.Y. 2018) (noting that the public interest is "disserve[d]" by an "unwarranted—and … unprecedented—judicial usurpation of responsibilities that Congress has expressly entrusted to [a federal agency]").

Moreover, an injunction that asks the Court to develop, implement, and enforce workplace safety practices related to COVID-19 only risks creating further uncertainty in an already unprecedented environment. It is likely to set off a chain reaction of litigation against essential businesses, which could lead to an inconsistent framework of requirements. This would directly undermine the "public interest in promoting uniformity in the law." *Liuksila v. Turner*, 2018 WL 6621339, at *2 (D.D.C. Dec. 18, 2018) (citing *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 464 (8th Cir. 1993)). As another federal court acknowledged in this context, although "public health is naturally a matter of public concern … a preliminary injunction is not in the public interest at this time." *Baxley v. Jividen*, 2020 WL 1802935, at * 8

(S.D. W. Va. Apr. 8, 2020) (denying request to require a prison to develop and implement a COVID-19 exposure plan where the prison had already implemented its own policies which "temper[ed] public health worries").

In sum, the public interest is better served if the Court declines Plaintiffs' invitation to police Smithfield's safety program, and leaves that task to OSHA and the public health authorities that are already engaged at the Plant, and the Secretary of Agriculture to which the President has designated authority over the precise matters at issue in this case. *See* Defendants' Supporting Suggestions in Support of Emergency Motion to Dismiss (ECF No. 29) and Notice of Supplemental Authority (ECF No. __), which are incorporated by reference herein.

**E.      The Requested Injunction Is Overreaching and Improper.**

Last, the injunction sought is, at its core, an improper request for relief both because it lacks necessary specificity and because it is overly broad.

An injunction must be "specific in [its] terms." Fed. R. Civ. P. 65(d). This requirement is "designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816, 820 (8th Cir. 1977). An injunction must provide a person of ordinary intelligence a reasonable opportunity to understand what is prohibited. *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997); *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers*, 415 U.S. 423, 444 (1974) ("[O]ne basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits.").

Moreover, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702

(1979); *see also Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable.").

Here, the preliminary injunction sought by Plaintiffs seeks to impose vague requirements on Smithfield that would inevitably lead to disputes over compliance, and turn this Court into a referee over workplace safety issues. The requested injunction seeks to require Smithfield to "[e]nsure social distancing throughout the Plant, including on the lines," but fails to articulate how this is to be accomplished or why the policies and procedures already in place are not sufficient to meet this requirement. Pl.'s Br. at 2. The proposed injunction would require Smithfield to "[e]nsure high-touch surfaces are disinfected with a suitable cleaning agent throughout the day" but fails to provide any guidance as to what is "suitable" or what "throughout the day" means or why the current protocols are insufficient. *Id.* The injunction seeks to require Smithfield to "[c]hange all relevant policies to meaningfully encourage workers who are diagnosed …" but does not identify the "relevant policies" or describe what is required to "meaningfully encourage" or specify why existing efforts are insufficient. *Id.*

Moreover, the injunction seeks to impose requirements on Smithfield that are impossible and beyond its control. For example, the USDA will not allow Smithfield to provide tissues to its line workers. Similarly, Smithfield cannot "ensure" that workers can obtain testing. Testing must be coordinated by a health care professional.

The injunction is also overly broad. Smithfield has demonstrated that its COVID-19 policies and procedures are consistent with OSHA and CDC guidance. Messman Decl. ¶¶ 9-18; Henshaw Decl. ¶¶ 20-25. Anything more is necessarily overly broad. This is true particularly with respect to Plaintiffs' request to permit its experts to inspect the Plant "to determine additional steps that should be taken." Pl.'s Br. at 3.

31

The purpose of a preliminary injunction is not to grant a plaintiff's wish list of mandatory requirements to impose on a defendant. It is, as the federal courts have clearly stated, to preserve the status quo pending a ruling on the merits of the underlying claim. The COVID-19 health and safety protocols implemented by Smithfield at the Milan Plant have already accomplished this task. *See Baxley*, 2020 WL 1802935, at *8 ("It would be redundant for the Court to order [COVID-19] relief that Defendants are in the midst of granting, and so the Court concludes that a preliminary injunction is not warranted here.").[23] The proposed preliminary injunction is improper and unnecessary, and should be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction and/or Temporary Restraining Order.

---

[23] *See Alaska State Employees Ass'n, Local 52 v. State of Alaska*, Case No. 3AN-20-05652CI at 18 (refusing to grant an injunction that would require the State to "follow the law and its own policies" because even an injunction purportedly to maintain the status quo could have negative implications "when faced with a pandemic of unprecedented magnitude").

**SMITHFIELD FOODS, INC. and
SMITHFIELD FRESH MEATS CORP.**


By: */s/ Jean Paul Bradshaw II*
    Jean Paul Bradshaw II (#31800)
    Mara H. Cohara (#51051)
    **Lathrop GPM LLP**
    2345 Grand Boulevard, Suite 2200
    Kansas City, Missouri 64108
    Telephone:  (816) 460-5507
    Facsimile:  (816) 292-2001
    jeanpaul.bradshaw@lathropgpm.com
    mara.cohara@lathropgpm.com

    Alexandra B. Cunningham *(admitted PHV)*
    **Hunton Andrews Kurth LLP**
    Riverfront Plaza, East Tower
    951 East Byrd Street
    Richmond, Virginia 23219-4074
    Telephone:  (804) 787-8087
    Facsimile:  (804) 788-8218
    acunningham@HuntonAK.com

    Susan F. Wiltsie *(admitted PHV)*
    **Hunton Andrews Kurth LLP**
    2200 Pennsylvania Avenue, NW
    Washington, District of Columbia 20037
    Telephone:  (202) 955-1500
    Facsimile:  (202) 778-2201

    *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of April, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of the same to the following counsel of record:

Gina Chiala (#59112)
**Heartland Center for Jobs and Freedom, Inc.**
4047 Central Street
Kansas City, MO 64111
Telephone: (816) 278-1092
Facsimile: (816) 278-5785
ginachiala@jobsandfreedom.org

David S. Muraskin *(admitted PHV)*
Karla Gilbride *(admitted PHV)*
Stevie K. Glaberson *(admitted PHV)*
**Public Justice**
1620 L. Street, NW, Suite 630
Washington, DC 20036
Telephone: (202) 797-8600
Facsimile: (202) 232-7203
dmuraskin@publicjustice.net
kgilbride@publicjustice.net
sglaberson@publicjustice.net

David Seligman *(admitted PHV)*
Juno Turner *(admitted PHV)*
**Towards Justice**
1410 High Street, Suite 300
Denver, CO 80218
Telephone: (720) 441-2236
Facsimile: (303) 957-2289
david@towardsjustice.org
juno@towardsjustice.org

*Counsel for Plaintiffs*

*/s/ Jean Paul Bradshaw II*
An Attorney for Defendants

34