# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## ST. JOSEPH DIVISION

| | | |
|---|---|---|
| RURAL COMMUNITY WORKERS ALLIANCE and JANE DOE,[1] | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 5:20-CV-06063-DGK |
| SMITHFIELD FOODS, INC. and SMITHFIELD FRESH MEATS CORP., | ) ) ) ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

This lawsuit arises from Plaintiffs' allegations that Defendant Smithfield Foods, Inc. and its wholly owned subsidiary, Defendant Smithfield Fresh Meats Corporation (collectively, "Smithfield") have failed to adequately protect workers at its meat processing plant in Milan, Missouri, ("the Plant" or "the Milan Plant") from the virus that causes COVID-19. Now before the Court are Plaintiffs' Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction (Doc. 3), and Smithfield's motion to dismiss and/or stay pursuant to the primary-jurisdiction doctrine (Doc. 28).

After carefully reviewing the motions and the existing record, the Court holds that it should decline to hear this matter pursuant to the primary-jurisdiction doctrine to allow the Occupational Health and Safety Administration ("OSHA") to consider the issues raised by this case. But even if the Court did not apply the primary-jurisdiction doctrine, the Court would not

---

[1] The Court notes that there is currently a motion pending to allow Jane Doe to proceed using a pseudonym (Doc. 42). Given the Court's dismissal of this action and the denial of injunctive relief, the Court finds that requiring Plaintiff to reveal her identity would serve no important purpose, especially given that another named plaintiff appears in this case. The issues presently before the Court are—for the most part—purely legal, and the majority of Plaintiff's allegations are not individualized. Thus, the public's interest in Plaintiff's identity and the prejudice to Smithfield in allowing Plaintiff to proceed anonymously for purposes of deciding the instant motions is minimal. Plaintiff Doe may therefore use a pseudonym for purposes of the motions presently before this Court. This Court reserves judgment on her ability to do so should this case proceed to further stages of litigation.

issue a preliminary injunction because Plaintiffs have not met their burden of proving that the extraordinary remedy of an affirmative injunction is justified. Smithfield's motion is GRANTED, and the case is DISMISSED WITHOUT PREJUDICE.

## Background

The Background section of this order is arranged in chronological order. Although regrettably lengthy, it details how the regulatory environment in which meat-processing plants operate is constantly changing during this unique national emergency.

In late 2019, a new coronavirus emerged named severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2).[2] This virus causes coronavirus disease 2019 (COVID-19), a respiratory illness that can cause serious health problems, including death.[3] SARS-CoV-2 is highly contagious; it appears to spread from person to person through respiratory droplets produced when an infectious person coughs, sneezes, or talks, and the virus can be spread by presymptomatic, or even asymptomatic, individuals.[4]

A global pandemic ensued, and the virus and COVID-19 reached the United States in early 2020. On March 13, 2020, the President declared a national emergency concerning COVID-19. That same day, Missouri's governor also declared a state emergency, and on April 3, the Missouri Department of Health and Senior Services issued a stay-at-home order that mandated all individuals abide by social-distancing requirements and closed all nonessential

---

[2] Ctrs. for Disease Control and Prev. & Occ. Safety and Health Admin., Meat and Poultry Processing Workers and Employers, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (April 26, 2020).

[3] *Id.*

[4] *Id.*

businesses in Missouri through May 4.[5]  The stay-at-home order defines essential businesses in accordance with guidance from the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency ("Homeland Security"), which identified livestock-slaughter facilities, including the Plant and its operations, as "critical infrastructure."[6]  On April 9, the Centers for Disease Control ("CDC") published *Interim Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, which outlined several policies and procedures employers should implement to help prevent workplace exposure and community spread of the virus.

On April 22, OSHA sent Smithfield a "Rapid Response Investigation" requesting information regarding its COVID-19 work practices and infection at the Milan Plant, giving Smithfield seven days to respond.  As part of its inquiry, OSHA requested information about Smithfield's COVID-19 practices including what, if any, personal protective equipment has been given to its workers, what engineering controls have been implemented, what contact tracing methods have been employed, and what policies have been changed or implemented in light of the pandemic (Doc. 29-2).  Smithfield responded on April 29 (Doc. 41).

The next day, on April 23, Plaintiffs Jane Doe and the Rural Community Workers Alliance ("RCWA") filed suit.  They allege Smithfield is not taking adequate steps to prevent transmission of the virus at its Plant, thereby endangering workers and members of the surrounding community.  According to her declaration, Doe is a current Smithfield employee who has worked at its Milan Plant for at least five years.  She claims she currently works on the

---

[5] Mo. Dep't of Health & Senior Servs., Stay at Home Order, https://governor.mo.gov/priorities/stay-home-order (Apr. 3, 2020).
[6] U.S. Dep't of Homeland Sec., Cybersec. & Infrastructure Sec. Agency, Guidance on the Essential Critical Infrastructure                                                                                              Workforce, https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_3.pdf (April 17, 2020).

"cut floor" where animals are broken down into products and packaged.

The RCWA is a Missouri non-profit advocacy group whose members consist exclusively of workers in Northern Missouri. Several members of RCWA's current leadership council work at the Plant, and sixty to seventy workers who attend its meetings work at the Plant, including Jane Doe.

Defendant Smithfield is one of the largest meat-processing companies in the world, with meat-processing plants all over the United States, including in Milan, Missouri. Several of its meat-processing plants in the United States have closed recently due to outbreaks of COVID-19 among its workers.

The Complaint (Doc. 1) alleges that several meat-processing plants in this country owned and operated by Smithfield have become major COVID-19 "hot spots." It also alleges that in direct contravention of CDC guidelines, Smithfield has not implemented certain precautions to keep its workers and the Milan community safe from the virus. Such measures include keeping adequate distance between workers, prohibiting workers from taking a break to wash their hands or face, preventing workers from covering their faces if they need to cough or sneeze, implementing a sick-leave policy that penalizes workers for missing work even if they are exhibiting COVID-19 symptoms, and failing to implement plans for testing and contact tracing.

The Complaint brings state-law claims for public nuisance and breach of duty to provide a safe workplace. Plaintiffs are not seeking monetary damages, only declaratory judgments stating that: (1) Smithfield's practices at the Plant constitute a public nuisance; and (2) Smithfield has breached its duty to provide a safe workplace.

The same day Plaintiffs filed suit, they also moved for a temporary restraining order and preliminary injunction (Doc. 3), seeking to force Smithfield to: provide masks; ensure social

4

distancing; give employees an opportunity to wash their hands while on the line; provide tissues; change its leave policy to discourage individuals to show up to work when they have symptoms of the virus; give workers access to testing; develop a contact-tracing policy; and allow their expert to tour the Plant. Attached to the motion were declarations from: (1) Jane Doe, who described working conditions at the Plant and stated she was afraid for health and safety, as well as the health and safety of the Milan community, because of what she considers inadequate safety procedures at the Plant; (2) RCWA's Executive Director, Alex Fuentes; (3) a senior lobbyist with the non-profit organization Food & Water Watch ("FWW"), Anthony Corbo; (4) a lawyer, Thomas Fritzsche, who has interviewed a number of Alabama poultry-plant workers about working conditions and authored a 2013 report for the Southern Poverty Law Center about modern industrial slaughterhouse workers; and (5) an occupational-medicine specialist, Dr. Robert Harrison, who works as Clinical Professor of Medicine at the University of California, and also serves the California Department of Public Health.

On April 26, the Court set a videoconference hearing on the preliminary injunction motion for April 30. That same day, the CDC and OSHA issued *Meat and Poultry Processing Workers and Employers – Interim Guidance* ("the Joint Guidance"), which provided supplemental guidance to meat-processing plants concerning COVID-19.[7] The Joint Guidance states that to reduce the risk of transmission among employees, employers at meat-processing facilities should, where "feasible," implement engineering controls, such as staggering shifts and breaks, requiring workers to stay six-feet apart, and/or erecting physical barriers; place handwashing or hand-sanitizing stations in multiple locations and encourage hand hygiene; give workers additional short breaks to wash hands; provide tissues; and allow workers to take breaks

---

[7] Ctrs. for Disease Control and Prev. & Occ. Safety and Health Admin., Meat and Poultry Processing Workers and Employers, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (Apr. 26, 2020).

in alternative areas to ensure social distancing.  It also recommends employers provide personal protective equipment for workers to use during their shift and increase the frequency of sanitization in work and common spaces.  It states employers should educate employees on measures they can take to decrease the risk of spreading the virus and provides a specific list of measures employers should take to promote social distancing, such as providing visual cues on floors, as reminders for social distancing.  It encourages employers to screen workers for COVID-19 by implementing temperature checks prior to entering the workplace and sending home workers who appear to have symptoms (e.g., cough, fever, or shortness of breath), and monitor workers' contacts so they can alert anyone who may have been exposed to the virus. Finally, it recommends employers review leave and incentive policies so as to not penalize workers for taking sick leave if they contract COVID-19.

On April 27, Smithfield filed a motion to dismiss this case pursuant to the primary-jurisdiction doctrine, arguing this Court should defer to OSHA in this case.  The next day—April 28—the President signed an executive order ("the Executive Order") under § 4511(b) of the Defense Production Act ("DPA"), 50 U.S.C. § 2061 *et seq*., delegating authority to the Secretary of Agriculture to take all appropriate action "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by" the CDC and OSHA.[8]

On April 29, Smithfield made several filings, including a supplemental brief to its motion to dismiss, which alleged that pursuant to the Executive Order, the United States Department of Agriculture ("USDA") now had jurisdiction over this case.  It also submitted its Suggestions in

---

[8] Exec. Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19, https://www.whitehouse.gov/presidential-actions/executive-order-delegating-authority-dpa-respect-food-supply-chain-resources-national-emergency-caused-outbreak-covid-19/ (Apr. 28, 2020).

Opposition (Doc. 32) to the preliminary injunction motion. Attached to its brief as exhibit A (Doc. 32-1) is a declaration from the Plant's general manager, Tim Messman, along with pictures of the Plant and copies of the Plant's policies and procedures related to COVID-19. Exhibit B (Doc. 32-2) is a declaration from John Henshaw, the head of OSHA from 2001 to 2003.

Later that same day, Plaintiffs' filed their suggestions in opposition (Doc. 35) to Smithfield's motion to dismiss. Included in it is a declaration from Dr. Melissa Perry (Doc. 35-2), a professor of environmental health at George Washington University.

On April 30, the Court held a hearing on the motion via teleconferencing. The Court offered the parties an opportunity to introduce evidence, including witness testimony, but both parties elected to stand on the existing record. The parties then argued their respective positions.

After the hearing, the parties filed supplemental briefs. Attached to Smithfield's brief (Doc. 46) is a supplemental declaration from Smithfield's plant manager, clarifying Smithfield's leave policy and updating the Court on additional safety changes at the Plant.

Plaintiffs concede that Smithfield implemented new policies and procedures after this lawsuit was filed and have narrowed their requested injunctive relief to direct Smithfield to:

> (1) make all reasonable changes to its "production practices," including potentially lowering its line speeds, to place as many workers as possible at least six feet apart; (2) provide reasonable additional breaks to allow workers to care for their personal hygiene without penalty, including blowing their noses, using tissues, and hand washing; and (3) ensure that its policies do not require workers to come to the Plant to obtain COVID-19-related sick leave and take all reasonable steps to communicate that policy clearly to workers.

(Doc. 48 at 10). Plaintiffs characterize their requested relief as compliance with the Joint Guidance.

### Findings of Fact

The Court gives the various declarations submitted by the parties the following

7

evidentiary weight.[9]

The Court gives Jane Doe's declaration limited weight. While she has personal knowledge of conditions in those parts of the Plant in which she works, it is unclear exactly what part of the "cutting floor" she works in, and whether she can see all that she claims to see from this area. Further, it appears that some of the information in her declaration is no longer accurate due to recent changes in the Plant's policies and procedures. For example, although her declaration may be correct that Smithfield initially told workers they would receive only one mask per week, this policy has been superseded. As discussed below, workers are now given masks every day. Finally, because her identify is unknown, there is no way to determine, through the adversarial process or otherwise, whether Doe has some bias against Smithfield that could lead her to misrepresent or exaggerate conditions at the Plant. The Court notes that at least one of her statements—that Smithfield has increased the line speed at the Plant during the pandemic—is contradicted by other, more persuasive evidence.

Mr. Fuentes' declaration concerning working conditions at the Plant are even less reliable than Jane Doe's, and so the Court gives them less weight. Mr. Fuentes has no personal knowledge of conditions at the Plant because he has never set foot in it. His understanding is based on hearsay from unidentified employees whose statements to him, even if accurately relayed by Mr. Fuentes, were not made under penalty of perjury. That said, the Court finds the portions of his declaration concerning RCWA's membership and activities are credible.

The Court finds the declarations of Messrs. Corbo, Fritzsche, and Harrison are based on some relevant knowledge, education, and experience concerning working conditions in American meat-processing plants generally, and so they possess some limited insight into what

---

[9] Smithfield filed a motion to strike Plaintiffs' five declarations attached to the motion for a temporary restraining order and/or preliminary injunction (Doc. 34). The Court denies the motion, since, in considering these motions, the issues it complains of go to the weight of the evidence rather than its admissibility.

steps could be taken to prevent the spread of the SARS-CoV-2 virus in a generic American meat-processing facility. Because they are unfamiliar with specific working conditions at the Plant, however, their declarations provide limited help in determining whether Smithfield's policies and procedure at the Plant are sufficient to stem transmission of the virus.

Finally, the Court turns to the declaration of Dr. Melissa J. Perry, Professor and Chair of Environmental and Occupational Health at the Milken Institute School of Public Health of the George Washington University. Dr. Perry credentials are excellent: She is a past President of the American College of Epidemiology and a past chair of the Board of Scientific Counselors for the CDC. She has also served as a member of the National Institute for Occupational Safety and Health research grant-review panel. She has studied meat-processing facilities since 2004 and has published six peer-reviewed-journal articles on work health and safety at meat-processing facilities. As part of that work, she has visited four meat-processing plants and spoken with engineers regarding the organizational structure of processing plants and how they can be redesigned to further worker health and safety.

Dr. Perry opines that meat-processing plants can allow workers to stand six feet apart if they reduce production line speed, and that, if they do not space production line workers six feet apart, the plants will "inevitably" have a COVID-19 outbreak. She contends slowing the production line is the only way the plant will be able to continue meat production without an outbreak. She also endorses the other requests Plaintiffs make, such as for more rest breaks and paid leave, as "absolutely necessary" so the Plant can continue operating.

This Court has respect for Dr. Perry's opinion but finds it of limited value in this case. While this Court agrees that slowing down line speed may be beneficial for workers and allow more opportunities for social distancing, the Court found nothing in the Joint Guidance

recommending a decrease in line speed. To that point, she provides no specific opinion regarding whether the Milan Plant is currently in compliance with the Joint Guidance, and there is no evidence that Dr. Perry reviewed the policies and procedures at the Milan Plant in forming her opinion. Accordingly, the Court gives little weight to her opinion that unless the production line speed is slowed and workers spread six feet apart, spread of the virus through the Plant is "inevitable" and it "will be forced to shutter." This assertion appears to be more of a good-faith speculation than an evidenced-based conclusion.

The Court gives more weight to the declarations provided by Smithfield. The statements made by Mr. Messman, the Plant's general plant manager, are almost all based on his personal knowledge. He possesses the most recent information concerning working conditions at the Plant, and he appears to be a reliable source of information about Smithfield's policies and procedures there.

The Court gives considerable weight to the declaration of John Henshaw, Smithfield's expert witness. After reviewing Smithfield's written policies and procedures at the Plant, the general manager's declaration, the pictures, and the declarations in Plaintiffs' motion, Mr. Henshaw opined that Smithfield's current policies and procedures, if followed, were consistent with the Joint Guidance as of April 29, 2020. Although the Court is aware that he is a retained expert witness whose assumptions and conclusions have not been tested by cross-examination, his opinion is measured, qualified, and grounded in the facts at the Milan Plant.

With the credibility determinations in mind, the Court makes the following findings of fact concerning current the Plant's working conditions and Smithfield's COVID-19 policies and procedures.

Before entering the Plant, Smithfield requires all employees to undergo thermal screening. If employees exhibit one primary symptom or two secondary symptoms of COVID-19,[10] Smithfield provides them with instructions for next steps, including directions to quarantine and call their physician for guidance, and sends the employee home for fourteen days of paid leave or until the individual receives a negative COVID-19 test result. Employees with underlying health concerns—verified by a doctor—that place them at a higher risk of COVID-19 are given fourteen days of paid leave and then are shifted to short-term disability leave.

While quarantining as a result of COVID-19 symptoms, Smithfield requires employees to complete a questionnaire that in part entails naming all other employees they have closely contacted within the two days before experiencing symptoms. If the employee tests positive for COVID-19, Smithfield notifies and screens the close contacts. As of April 29, 2020, thirteen employees had been tested for COVID-19. None were positive.

If employees miss work as a result of COVID-related symptoms, Smithfield does not penalize them. They do not receive attendance points and remain eligible for Smithfield's Responsibility Bonus ($500), regardless of whether individuals provide a doctor's or nurse's note. Moreover, Smithfield has expanded its employee benefits by eliminating co-pays for COVID-related testing and treatment.

To ensure that those inside the Plant are complying with Smithfield's COVID-19 safety procedures and policies, Smithfield has assigned both a nurse and a health-and-safety clerk to perform checks throughout the Plant. Smithfield has communicated these procedures and policies to its employees by several different media, including on televisions and signs at the Plant, through the Beekeeper communications app, and through the Textcaster mass

---

[10] Primary symptoms include fever, persistent dry cough, and shortness of breath, while secondary symptoms include chills, repeated shaking with chills, muscle pain/extreme fatigue, headache, sore throat, and/or loss of taste or smell (Doc. 46-2 at 8).

text-messaging tool.  Signs at the Plant relay the information in English, Spanish, and French, while the Beekeeper and Textcaster communications are available in the employee's language of choice.  Interpreters are also available at the Plant to assist with these communications.

The Plant provides workers with an ear-looped face mask upon entry to the Plant each day, and if a mask breaks or becomes soiled, it provides a new one.  Smithfield now requires all workers at the Plant to wear a mask at all times other than during meals and in certain offices where employees are spaced six feet apart.  These masks prevent the spread of germs if an employee sneezes or coughs while on the line, reducing the need for tissues to reduce the spread of COVID-19.  Additionally, Smithfield requires employees on the production floor to wear nitrile gloves and a plastic face shield.

As Smithfield concedes, it does not provide tissues to employees.  It cannot provide tissues to individuals working on the production line because doing so would violate health standards set by the USDA.  Thus, one of Plaintiff's original complaints cannot be remedied. Smithfield could, however, provide tissues for employees to wipe their nose while on breaks, but the record does not support that employees are banned from bringing their own tissues or other hygienic wipes to use while on breaks.

As for Plaintiffs' claim that Smithfield does not allow employees to wash their hands without penalty, the Court finds that Smithfield policies and procedures are reasonable under the circumstances.  Due to the nature of the meat-processing business, employees must wear gloves on the production line.  When workers leave the line for a break, they remove their gloves and sanitize their hands before entering common areas.  They must also wash their hands and put on gloves before returning to the line.  Smithfield currently administers hand sanitizer to employees every thirty minutes to use on their gloves and has added approximately 110 hand-sanitizing

stations throughout the Plant. Smithfield also expects a shipment of small hand-sanitizer bottles soon, which it will make available to employees for personal use. In the meantime, the Plant has invited employees to bring in personal bottles they may refill using the company supply. Thus, the need for continued hand washing is unnecessary because any contamination that may occur on the line is contained by the required use of gloves.

Moreover, Smithfield has also enhanced cleaning and disinfection of the Plant's frequently touched surfaces in common areas using cleaning solutions identified by the CDC for use against the virus. These cleanings are performed as often as every two hours throughout the workday. Additional deep cleanings occur over the weekends, and Smithfield is working to implement use of fogging/misting disinfectants where possible.

Finally, the Court turns to the steps Smithfield has taken steps to facilitate social distancing at the Plant. Smithfield has staggered workday start times, as well as lunch and break times, to avoid large numbers of workers congregating in break rooms or around time clocks. Smithfield is currently working to secure a wireless means for employees to clock in and out of their shifts to minimize crowding. In the meantime, it has expanded the number of available clocks for employees to use and will implement a grace period for workers to clock in and out of their shifts, all increasing the ability of workers to maintain social distance.

Smithfield has erected two large tents and three carport structures on the Plant lawn and placed tables and chairs underneath each so that workers have more space to eat while on breaks. The Plant has also installed plastic barriers on eating tables that separate employees from those sitting beside and across from them. Tables are sanitized after one employee leaves and before another sits down.

Smithfield has also reduced the number of hogs harvested each day and sends some employees home before lunch. This requires fewer employees to be at the Plant, helping to minimize crowding in the cafeteria and other areas. However, these policies reduce the number of hours worked by the affected employees, thereby decreasing their weekly pay. To ease the resulting financial burden on employees, Smithfield has temporarily increased pay by $5/hour, and such pay is available to any employee who takes an approved leave as a result of COVID-related symptoms. Smithfield has also installed clear plastic barriers along the Plant production line to separate employees working across from each other and employees working side by side.

## Discussion

### I. The primary-jurisdiction doctrine applies.[11]

Before reaching the merits of Plaintiffs' request for a preliminary injunction, the Court must determine whether it should dismiss or stay this case pursuant to the primary-jurisdiction doctrine. "Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making." *Access Telecomms. v. Sw. Bell Tel. Co.,* 137 F.3d 605, 608 (8th Cir. 1998) (citation omitted). "The doctrine allows a district court to refer a matter to the appropriate administrative agency for ruling in the first instance, even when the matter is initially cognizable by the district court." *Id.* (citation omitted). "There exists no fixed formula for determining whether to apply the doctrine of primary jurisdiction." *Id.* (citing *United States v. W. Pac. R.R. Co.,* 352 U.S. 59, 64 (1956)). Instead, courts must consider in each case "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes

---

[11] Although Smithfield previously argued *Burford* abstention also applied here, it conceded during the preliminary-injunction hearing that that argument no longer applies due to the President's Executive Order. Accordingly, the Court does not address it. Because this Court finds the primary jurisdiction doctrine applies, it does not address Smithfield's preemption arguments, which were asserted after the preliminary-injunction hearing.

14

for which the doctrine was created." *Id.* (citation omitted). In undertaking this analysis, a court must be mindful that the primary-jurisdiction doctrine "is to be invoked sparingly, as it often results in added expense and delay." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005). "Once a district court decides to refer an issue or claim to an administrative agency under the doctrine of primary jurisdiction, it may either dismiss or stay the action." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 913 (8th Cir. 2015).

There are two primary reasons courts apply the primary-jurisdiction doctrine. First, "to obtain the benefit of an agency's expertise and experience . . . 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion. . . .'" *Access Telecomms.*, 137 F.3d at 608 (noting "'agencies created by Congress for regulating the subject matter should not be passed over'") (quoting *Far E. Conference v. United States*, 342 U.S. 570, 574 (1952)). Second, "to promote uniformity and consistency within the particular field of regulation." *Id.* (citation omitted). Thus, in deciding whether to apply the doctrine, courts focus on two questions: (1) "whether the issues raised in the case 'have been placed within the special competence of an administrative body,'" and (2) whether the court's disposition of the case could lead to inconsistent regulation of businesses in the same industry. *Sprint Spectrum L.P. v. AT&T Corp.*, 168 F. Supp. 2d 1095, 1098 (W.D. Mo. 2001) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. at 64). In this case, the answer to both questions is yes.

Plaintiffs allege that because the Plant is not abiding by the Joint Guidance, it constitutes a public nuisance and has created an unreasonably unsafe workplace. Thus, Plaintiffs' claims both succeed or fail on the determination of whether the Plant is complying with the Joint Guidance. Due to its expertise and experience with workplace regulation, OSHA (in

coordination with the USDA per the Executive Order) is better positioned to make this determination than the Court is. Indeed, this determination goes to the heart of OSHA's special competence: its mission includes "enforcing" occupational safety and health standards. In fact, OSHA has already shown interest in determining whether the Plant is abiding by the Joint Guidance. The day before Plaintiffs filed this lawsuit, OSHA sent Smithfield a request for information regarding its COVID-19 work practices and infection at the Plant.

Turning to the second question, the Court finds only deference to OSHA/USDA will ensure uniform national enforcement of the Joint Guidance. If the Court ruled on whether the Plant is complying with the Joint Guidance, this ruling would be binding on Smithfield but not other meat-processing facilities because the Court lacks personal jurisdiction over them. Thus, any determination by this Court whether the Plant is complying with the Joint Guidance could easily lead to inconsistent regulation of businesses in the same industry. And under these circumstances, where the guidelines are rapidly evolving, maintaining a uniform source for guidance and enforcement is crucial.

Plaintiffs' argue that deference will add delay. But OSHA has already requested information about the Plant's safety measures. And if OSHA fails to act quickly on this information, Plaintiffs have a remedy: they may receive emergency relief through OSHA's statutory framework. Section 662(a) of the Occupational Safety and Health Act ("the Act"), 29 U.S.C. §§ 651 *et seq.*, permits the Secretary of Labor to petition the court "to restrain any [dangerous] conditions or practices in any place of employment . . . which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by [the Act]." Upon the filing of such petition, "the district court shall have jurisdiction to grant such injunctive

16

relief or temporary restraining order pending the outcome of an enforcement proceeding." *Id*. at § 662(b). If the Secretary "arbitrarily or capriciously fails to seek relief," a worker can file a writ of mandamus to compel the Secretary to seek such an order. *Id*. at § 662(d). Granted, there may be some delay before Plaintiffs can invoke this procedure, but following this procedure ensures the USDA and OSHA can take a measured and uniform approach to the meat-processing plants under its oversight. The Court's intervention at this point, on the other hand, would only risk haphazard application of the Joint Guidance.

In sum, the Court holds that the issue of Smithfield's compliance with OSHA's guidelines and regulations falls squarely within OSHA/USDA's jurisdiction. The Court finds dismissal without prejudice is preferable to a stay here so that Plaintiffs may seek relief through the appropriate administrative and regulatory framework.

## III.    Plaintiffs' have not met their burden for a preliminary injunction.

Although the Court's ruling on the primary-jurisdiction doctrine is dispositive, to aid in any appellate review, the Court will consider whether Plaintiffs have met their extraordinary burden of proving an affirmative preliminary injunction is proper in this case.

In determining whether to grant injunctive relief the Court considers the following factors, which were set forth in the seminal decision *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981): 1) the threat of irreparable harm to the movant; 2) the balance between this harm and any injury that granting the injunction will inflict on the non-moving party; 3) the likelihood that the moving party will prevail on the merits; and 4) the public interest. *Phelps-Roper v. Nixon*, 509 F.3d 480, 484 (8th Cir. 2007). No single factor is determinative; they must be "balanced to determine whether they tilt towards or away" from

granting the injunction. *Noodles Dev., LP. v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030, 1034 (E.D. Mo. 2007).

Preliminary injunctive relief "is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *North Dakota v. U.S. Army Corps of Eng'rs*, 264 F. Supp. 2d 871, 878 (N.D. 2003) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). This burden is particularly great where, as here, Plaintiffs seek a preliminary injunction requiring an affirmative act. *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 484 (8th Cir. 1993).

### 1. Plaintiffs have not demonstrated a threat of irreparable harm.

To demonstrate a sufficient threat of irreparable harm, the moving party must show that there is no adequate remedy at law; that is, that an award of damages cannot compensate the movant for the harm. *See Noodles Dev.*, 507 F.Supp.2d at 1036-37. But, when analyzing this factor, the Eighth Circuit has held that "[m]erely demonstrating the 'possibility of harm' is not enough." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015); *see also S.J.W. ex rel Wilson v. Lee's Summit R–7 Sch. Dist.,* 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction."). In the context of a global pandemic, this Court must consider the threat after "accounting for the protective measures" defendant has already implemented. *Valentine v. Collier*, --- F.3d ---, 2020 WL 1934431, *5 (5th Cir. Apr. 22, 2020).

Plaintiffs argue that their injury is potentially contracting COVID-19, which could result in serious illness or even death. But this type of injury is too speculative under Eighth Circuit precedent.

Plaintiffs' claim otherwise, citing two cases from the Eighth Circuit, which they argue held the possibility of "death or serious illness" constitutes an irreparable injury (Doc. 3 at 24). Plaintiffs' cite *Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003), a case in which the state of Nebraska revoked a program providing medical care for the needy. The plaintiffs, who suffered from physical and mental disabilities and received their prescription medications through the program, sought to enjoin revocation of the program. *Id*. The Eighth Circuit held that the present danger to plaintiffs' health without their medications is an irreparable harm. *Id*. Plaintiffs also cite *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993), which similarly held that denial of coverage for the treatment of a life-threating illness is an irreparable injury. These two cases are inapposite, since the plaintiffs were already suffering from illnesses, and would undoubtedly suffer serious illness or death in the absence of an injunction.[12] In other words, the threat of serious injury or death was a certainty and not merely a possibility.

The Court is not unsympathetic to the threat that COVID-19 presents to the Plant's workers. But in conducting its analysis, the Court must determine whether Plaintiffs will suffer an actual, imminent harm if the injunction is denied. This is not the same as analyzing whether employees risk exposure if they continue to work, and, unfortunately, no one can guarantee health for essential workers—or even the general public—in the middle of this global pandemic.

---

[12] Plaintiffs also cite *Mertzlufft v. Bunker Res. Recycling & Reclamation, Inc*., 760 S.W.2d 592 (Mo. Ct. App. 1988) as persuasive authority. In *Mertzluff*, the plaintiffs sought to enjoin a business which was illegally transporting, storing, and incinerating hazardous waste without a permit. *Id*. at 595. The plaintiffs brought a citizen's suit to enjoin the defendant from charging and loading the incinerator with hospital wastes, or otherwise operating it, which the trial court granted. *Id*. The Missouri court of appeals, reviewing the case under a standard deferential to the trial court's judgment—not operating under the preliminary injunction standard set forth in *Dataphase*—held that the preliminary injunction was warranted. *Id*. at 598. It did not, however, address whether the plaintiffs proved there was a threat of irreparable harm. *Id*. at 598. To the contrary, the court held that plaintiffs were "not obligated to allege and prove they had suffered irreparable harm in order to obtain injunctive relief, but were only required to prove that they were adversely affected in fact by the unlicensed operation, which they did." *Id*. Accordingly, this case is also inapplicable because the court of appeals did not consider—and plaintiffs were not required to prove—a threat of irreparable harm. But, even if they were, the defendant was illegally operating a hazardous waste facility, and thus presented a present threat of certain harm to the plaintiffs.

19

But given the significant measures Smithfield is now taking to protect its essential workers from COVID-19 and the fact that there are no confirmed cases of COVID-19 currently at the Plant, the Court cannot conclude that the spread of COVID-19 at the Plant is inevitable or that Smithfield will be unable to contain it if it occurs. Thus, Plaintiffs have not established an immediate threat of irreparable harm.

### 2. Plaintiffs have not shown that the balance of harms favors issuing injunctive relief.

The second factor "examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Noodles Dev.*, 507 F. Supp. 2d at 1038 (citing *Dataphase*, 640 F.2d at 114). "To determine what must be weighed, . . . courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction." *Id.* The "potential economic harm to the parties" is a relevant consideration, as is "whether the defendant has already voluntarily taken remedial action." *Id.*

Here, there is no doubt that if workers at the Plant contract COVID-19, the harm to Plaintiffs could be great. But Plaintiffs have alleged only that—potential harm—and, in this time, no essential-business employer can completely eliminate the risk that COVID-19 will spread to its employees through the workplace. Thus, it is important that employers make meaningful, good faith attempts to reduce the risk. Here, Smithfield has taken significant remedial steps in accordance with the Joint Guidance to protect its workers from COVID-19.

Moreover, national and local guidance on COVID-19 is continuously evolving and changing. An injunction would deny Smithfield the flexibility needed to quickly alter workplace procedures to remain safe during the ever-changing circumstances of this pandemic. *Valentine*, 2020 WL 1934431 at *5 (staying injunction that would "interfer[e] with the rapidly changing and

flexible system-wide approach that [defendant] has used to respond to the pandemic so far" and "[defendant's] ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches") (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 28–29 (1905); *In re Abbott*, 954 F.3d 772, 791 (5th Cir. 2020)). Thus, the remedial measures Smithfield has implemented convince the Court that the balance of harms weighs in its favor.

### 3. Plaintiffs have not shown a likelihood of success on the merits.

To demonstrate likelihood of success on the merits, a movant does not need to show that it ultimately will succeed on its claims, only that the movant's prospects for success is *sufficiently likely* to support the kind of relief it requests. *See Noodles Dev.*, 507 F.Supp.2d at 1036–37 (emphasis added) (citations omitted). That is, the movant need only show "a fair chance of prevailing." *Phelps-Roper*, 509 F.3d at 485. On this record, Plaintiffs have not shown a fair chance of prevailing on either of their claims.

### a. Plaintiffs have not shown they are likely to succeed on their public-nuisance claim.

Under Missouri law, "a public nuisance is an offense against the public order and economy of the state and violates the public's right to life, health, and the use of property, while 'at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons.'" *State* ex rel. *Schmitt v. Henson*, ED 107970, 2020 WL 1862001, at *4 (Mo. Ct. App. April 14, 2020) (citations omitted).

The parties agree that the Plant cannot be a public nuisance simply by virtue of the fact that it is a meat-processing plant during a global pandemic. Moreover, in this case, Smithfield has implemented substantial health and safety measures to protect Plant workers, and no

employees of the Plant have been diagnosed with COVID-19. While Plaintiffs argue that Smithfield could do more to protect its workers, that is not the issue before this Court. The issue is whether the Plant, as it is currently operating, constitutes an offense against the public order. Because of the significant measures Smithfield has implemented to combat the disease and the lack of COVID-19 at the facility, the Plant cannot be said to violate the public's right to health and safety. Thus, the Court finds that Plaintiffs are unlikely to be succeed on their public nuisance claim.

> **b.** **Plaintiffs have shown they are unlikely to succeed on their right to a safe workplace claim.**

Under Missouri law, Plaintiffs must prove that Smithfield negligently breached its duty to provide a safe place to work and that such negligence was the direct and proximate cause of the Plaintiffs injuries. *Hamilton v. Palm*, 621 F.3d 816, 818 (8th Cir. 2010). As discussed, Smithfield has taken substantial steps to reduce the potential for COVID-19 exposure at the Plant and appears to the Court to be complying with the Joint Guidance regarding the same. Thus, Plaintiffs are not substantially likely to prove Smithfield breached any duty.

More importantly, however, Plaintiffs have not alleged they have suffered any injury, only that they may suffer an injury in the future. A potential injury is insufficient to state a claim of the breach of the duty to provide a safe workplace under Missouri law. Plaintiffs citation to *Smith v. W. Elec. Co.*, 643 S.W.2d 10 (Mo. Ct. App. 1982), to establish that they have stated a sufficient injury is unavailing. In *Smith*, the plaintiff proved that he had been exposed to harmful second-hand smoke in the workplace which caused him to suffer a severe adverse reaction. *Id.* at 12. The adverse reaction was the actual injury he suffered, and he suffered this harm—and sought relief through an administrative process—before seeking an injunction. Thus, *Smith* is not analogous to this case, and Plaintiffs have not shown they are likely to be successful on their

breach of a safe workplace claim.

**4.    The public interest factor is neutral.**

Certainly, the spread of COVID-19 is a public-health matter of great concern, and, so, preventing transmission of the virus which causes COVID-19 is within the public interest. At the same time, the public has an interest in maintaining the food-supply chain and access to meat products, an interest which might be impaired if the Court granted the injunction. Because Smithfield's current policies and procedures temper public health worries, the Court finds a preliminary injunction is not in the public interest at this time.

Thus, Plaintiffs have not met their extraordinary burden of showing an affirmative preliminary injunction is warranted in this case.

## III.    Plaintiffs' requested relief lacks the specificity required for a preliminary injunction.

Finally, the Court finds that Plaintiffs requested relief is impermissibly vague. Federal Rule of Civil Procedure 65(d) states that an injunction must be "specific in [its] terms" and describe in reasonable detail the actions sought to be enjoined. Fed. R. Civ. P. 65(d). This specificity requirement is "designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Helzberg's Diamond Shops, Inc. v. Valley W. Des Moines Shopping Ctr., Inc.*, 564 F.2d 816, 820 (8th Cir. 1977).

In this case, Plaintiffs request this Court enter an injunction requiring Smithfield to "make all reasonable changes to its 'production practices,' including potentially lowering its line speeds, to place as many workers as possible at least six feet apart" (Doc. 46 at 10). Plaintiffs do not explain what changes would be "reasonable," except for "potentially" reducing line speeds. In other words, they do not specify in reasonable detail what Smithfield should do. They

demand workers have "reasonable additional breaks to allow workers to care for their personal hygiene without penalty, including blowing their noses, using tissues, and hand washing," but they do not specify how often or how long such breaks should take place, or what would constitute a reasonable break. Finally, Plaintiffs request the Court order Smithfield to change its policies to "not require workers to come to the Plant to obtain COVID-19-related sick leave and take all reasonable steps to communicate that policy clearly to workers." But Plaintiffs do not identify which policies should be eliminated, what constitutes "reasonable steps," or why Smithfield's current policies are insufficient. Because "a person of ordinary intelligence" would not understand what is prohibited based on Plaintiffs' proposed preliminary injunction, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383 (1997), it is impermissibly vague, and thus unenforceable.

**Conclusion**

Plaintiffs are naturally concerned for their health and the health of their community in these unprecedented times. The Court takes their concern seriously. Nevertheless, the Court cannot ignore the USDA's and OSHA's authority over compliance with the Joint Guidance or the significant steps Smithfield has taken to reduce the risk of a COVID-19 outbreak at the Plant.

For the reasons discussed above, Defendants motion to dismiss is GRANTED, and the case is DISMISSED without prejudice.

**IT IS SO ORDERED.**

Date:   May 5, 2020          __/s/ Greg Kays_____
                             GREG KAYS, JUDGE
                             UNITED STATES DISTRICT COURT